#28583-a-SRJ
**2019 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JASON PAUL LEWANDOWSKI,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON S. FLEMMER
Judge

* * * *

THOMAS L. SANNES of
Delaney, Nielsen & Sannes, P.C.
Webster, South Dakota

CHRISTOPHER D. DOHRER                    Attorneys for defendant
Aberdeen, South Dakota                    and appellant.


MARTY J. JACKLEY
Attorney General

MIKAL G. HANSON
PAUL S. SWEDLUND
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                    and appellee.

* * * *

CONSIDERED ON BRIEFS ON
NOVEMBER 12, 2018
OPINION FILED **01/02/19**

#28583

JENSEN, Justice

[¶1.]     Jason Lewandowski was convicted of first degree felony murder, commission of a felony while armed with a firearm, and burglary in the first degree stemming from the shooting death of Jeremy Hendrickson (Jeremy). Lewandowski appeals, arguing the circuit court should have suppressed his statements to law enforcement during a custodial interrogation on the night of the shooting because those statements were obtained in violation of his Fifth Amendment right to counsel and his right against self-incrimination. Lewandowski also claims the circuit court erred by refusing to compel specific performance of a plea agreement that he alleges would have allowed him to plead guilty to manslaughter. We affirm.

**Facts and Procedural History**

[¶2.]     Lewandowski lived on a farm in Day County and had joint custody of his son, S.L., following Lewandowski's divorce. Jon and Judy Hendrickson were Lewandowski's neighbors. Lewandowski considered Jon a good friend and had a friendly relationship with Jon's son Jeremy.

[¶3.]     Jon passed away in 2011. After Jon died, Lewandowski began an intimate relationship with Judy that strained his relationship with Jeremy. On July 21, 2012, this strain led to a physical altercation in which Lewandowski claimed he was assaulted by Jeremy and two of his friends. The Day County Sheriff's office and the South Dakota Division of Criminal Investigation (DCI) investigated the incident. DCI agent Stanley Lunzman was involved in the investigation and established a friendly professional relationship with Lewandowski as a result. Jeremy eventually pleaded no contest to a charge of

-1-

disorderly conduct for his involvement in the July 21 incident. Lewandowski claimed he suffered continual pain and disability from injuries sustained in the incident and held a grudge against Jeremy.

[¶4.]     On November 20, 2015, Lewandowski claims he aggravated his injuries when he tripped and fell in a ditch after deer hunting. Lewandowski returned to his Datsun pickup and stopped at a bar in Pierpont to, as he claims, self-medicate his pain with alcohol. Lewandowski told law enforcement he sat at the end of the bar to help support his back and knee and had two drinks. At trial, the State disputed Lewandowski's version of these events and presented video evidence showing Lewandowski walking around the bar speaking with patrons and consuming at least four drinks. According to the State, Lewandowski never mentioned his fall or pain to anyone in the bar.

[¶5.]     When Lewandowski returned home, he began conversing with S.L. and S.L.'s friend. The conversation turned into a heated argument, culminating in Lewandowski picking up a television and throwing it against the wall. Lewandowski then drove away from the home, now driving his Ram pickup truck, where he kept a .22 caliber Luger pistol in the glove box.

[¶6.]     Lewandowski drove to Jeremy's home, arriving around 9:30 p.m. Jeremy's wife, Leslie, testified that she and Jeremy heard a vehicle drive into the yard of their rural home, but were unable to identify who had entered the property. Jeremy and Leslie were in the bedroom with their two children when they heard the backdoor to the house slam open. Lewandowski then charged into the bedroom. Lewandowski admitted at trial that he entered the bedroom and confronted Jeremy

asking him, "why they did what they did" and "why Jeremy had anger toward him[,]" and then shot Jeremy in the head. Leslie testified that Lewandowski stormed into the house, said, "I'm sick of this shit you mother fucker," put his .22 caliber pistol to Jeremy's head and shot him. After the shooting, Lewandowski ran out of the house and drove to his home.

[¶7.]      Jeremy was transported to a local hospital and then flown to a hospital in Fargo for advanced medical treatment. Jeremy was placed on artificial life support because of severe brain damage from the bullet. Jeremy never regained consciousness. He was taken off life support on December 9, 2015, and died the same day.

[¶8.]      When Lewandowski returned home, he told S.L., "I just killed Jeremy." S.L. testified that Lewandowski told him to take the Ram pickup and drive to S.L.'s mother's home in Langford. Later that night, S.L. was questioned by law enforcement and it was discovered that Lewandowski's .22 Luger pistol was missing from the console of the Ram pickup.

[¶9.]      Lewandowski left his home and arrived at his brother's home in Groton around 10:00 p.m. Lewandowski's brother was not home, but Lewandowski's sister-in-law and niece were home. Lewandowski told his sister-in-law that he had "killed the mother fucker that ruined [his] life," and that they were probably never going to see him again. Lewandowski's brother learned what had occurred and called law enforcement.

[¶10.]      Lewandowski left his brother's home and was spotted by law enforcement driving toward Aberdeen. Lewandowski refused to pull over for law

enforcement leading to a high-speed chase. Lewandowski reached Aberdeen and exited his vehicle at a hospital, but failed to follow the directives of law enforcement. Lewandowski was eventually subdued by law enforcement after being Tasered twice.

[¶11.] Lewandowski was placed into custody and taken into the hospital where his Taser injuries were treated and photographed. Lewandowski's blood alcohol level was tested and revealed a blood alcohol content (BAC) of .164. Agent Lunzman arrived at the hospital to question Lewandowski. While Lunzman was waiting for the hospital room to clear and before advising Lewandowski of his *Miranda* rights, Lunzman began making some general comments to Lewandowski, explaining he wanted to talk to him in a few minutes. Lewandowski made several statements during this time, such as "I'm sorry, sorry man," "I done a bad thing," and "I fucked up." After the room was cleared, Lunzman read Lewandowski his *Miranda* rights and Lewandowski acknowledged that he understood his rights. Lunzman then began asking Lewandowski questions about the shooting. Lunzman was aware of Lewandowski's BAC level during the questioning.

[¶12.] After Lewandowski was treated and examined at the hospital, he was transported to the Brown County jail. Lunzman traveled to the jail to continue the interrogation. At the jail, Lunzman again administered *Miranda* rights, and Lewandowski stated he understood the rights. The following exchange then occurred:

> **Lewandowski:** Now I'm gonna ask a stupid question.
> **Lunzman:** There's no such thing as a stupid question Jason.
> **Lewandowski:** What, worthless attorney am I gonna get appointed?

>**Lunzman:** Don't know. Couple steps ahead right now for what we're doing right now.

The interrogation continued until Lewandowski said, "I suppose I should have an attorney called huh [sic]."

[¶13.] Lewandowski was charged with first- and second-degree murder, commission of a felony while armed with a firearm, and first-degree burglary. He entered pleas of not guilty by reason of insanity to all the charges, but later withdrew his insanity pleas and pleaded not guilty to the charges. Lewandowski also moved to suppress the statements he made to Lunzman on the night of the shooting. He argued that any statements he made before being advised of his *Miranda* rights should be suppressed, he did not waive his *Miranda* rights, and that he invoked his right to counsel before questioning started at the Brown County jail. The court denied Lewandowski's motion.

[¶14.] Shortly before trial, Lewandowski's attorney and the Day County State's Attorney discussed the terms of a plea agreement by phone. Lewandowski claimed an agreement was reached during the phone call, allowing him to enter a guilty plea to first-degree manslaughter in lieu of the murder charges. He claimed the State improperly withdrew the plea agreement later that evening after the victim's family objected to the plea agreement. Lewandowski moved for specific performance arguing that the State was bound by the plea agreement. Neither party presented evidence or documents at the hearing, but instead presented their respective positions by argument. The court determined there was no meeting of the minds on the terms of the plea agreement and denied Lewandowski's motion.

[¶15.] Lewandowski was found guilty of first-degree felony murder, second-degree murder, commission of a felony while armed with a firearm, and first-degree burglary following a jury trial. The same day, the court imposed a life sentence on the conviction for first-degree felony murder, and five-year consecutive sentences on the convictions for commission of a felony while armed with firearm, and first-degree burglary.

[¶16.] Lewandowski raises two issues on appeal:

1. Whether the circuit court erred in denying Lewandowski's motion to suppress his statements made during the custodial interrogation.

2. Whether the circuit court erred in denying Lewandowski's motion for specific performance of the plea agreement.

### Standard of Review

[¶17.] "A ruling on a motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Diaz*, 2014 S.D. 27, ¶ 20, 847 N.W.2d 144, 154 (quoting *State v. Horse*, 2002 S.D. 47, ¶ 11, 644 N.W.2d 211, 217-18). In our evaluation of a motion to suppress, "we consider the totality of the circumstances . . . and giv[e] deference to the [circuit] court's findings of fact." *Id.* (quoting *State v. Ralios*, 2010 S.D. 43, ¶ 24, 783 N.W.2d 647, 655). We review de novo if a waiver of *Miranda* rights is voluntary. *State v. Tuttle*, 2002 S.D. 94, ¶ 6, 650 N.W.2d 20, 25.

[¶18.] "Generally, plea agreements are contractual in nature and are governed by ordinary contract principles." *State v. Waldner*, 2005 S.D. 11, ¶ 8 692 N.W.2d 187, 190 (quoting *State v. Stevenson*, 2002 S.D. 120, ¶ 9, 652 N.W.2d 735, 738). "[T]he 'existence of a valid contract is a question of law.'" *Behrens v.*

*Wedmore*, 2005 S.D. 79, ¶ 20, 698 N.W.2d 555, 566 (quoting *In re Estate of Neiswender*, 2000 S.D. 112, ¶ 9, 616 N.W.2d 83, 86). "If in dispute, however, the existence and terms of a contract are questions for the fact finder." *Id.* (quoting *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992)); *Geraets v. Halter*, 1999 S.D. 11, ¶ 12, 588 N.W.2d 231, 233. In the criminal context, "the [circuit] court's findings of fact are reviewed under the clearly erroneous standard, but we give no deference to the [circuit] court's conclusions of law." *State v. Fierro*, 2014 S.D. 62, ¶ 12, 853 N.W.2d 235, 239.

**Analysis & Decision**

1.    *Whether the circuit court erred in denying Lewandowski's motion to suppress his statements made during the custodial interrogations.*

[¶19.]    Because Lewandowski was in custody, he contends that his initial statements at the hospital, before his *Miranda* rights were administered, were obtained in violation of his right against self-incrimination. Lewandowski also argues that the circuit court should have suppressed his statements because there was never a valid waiver of his *Miranda* rights. Finally, Lewandowski claims that the questioning at the jail continued after he invoked his right to counsel. The State argues Lewandowski's statements were made after he was fully advised and waived his *Miranda* rights, and that Lewandowski did not invoke his right to counsel during the interrogation.

[¶20.]    When a person is in the custody of law enforcement and law enforcement intends to perform a custodial interrogation of that person, they are required to read them their *Miranda* rights. *State v. Blackburn*, 2009 S.D. 37, ¶ 9, 766 N.W.2d 177, 181. "After an officer has informed a suspect of his *Miranda* rights

and has determined that the suspect understands those rights, the officer must then determine if the suspect is willing to waive those rights and answer questions." *Tuttle*, 2002 S.D. 94, ¶ 14, 650 N.W.2d at 28 (quoting *State v. Leyva*, 951 P.2d 738, 744 (Utah 1997)). The State must prove there was a valid waiver by a preponderance of the evidence. *Id.* ¶ 8, 650 N.W.2d at 26. Proof of a valid waiver requires a showing that, "(1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them." *Id.* ¶ 9, 650 N.W.2d at 26.

[¶21.] "For a waiver determination, a court should consider a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition." *Id.* ¶ 7, 650 N.W.2d at 25. The explicitness of the waiver is also a factor for consideration. *Id.* ¶ 9, 650 N.W.2d at 26. "A *Miranda* waiver may be inferred from the defendant's understanding of the rights coupled with a course of conduct reflecting a desire to give up those rights." *Id.* ¶ 16, 650 N.W.2d at 29; *see also Berghuis v. Thompkins*, 560 U.S. 370, 385, 130 S. Ct. 2250, 2262, 176 L. Ed. 2d 1098 (2010) ("[T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384, 130 S. Ct. at 2262.

a. Pre-*Miranda* statements.

[¶22.] Lewandowski's initial statements to Lunzman, prior to Lunzman reading Lewandowski his *Miranda* rights, were not made in response to any questions. In fact, Lunzman twice told Lewandowski to, in effect, wait a few minutes for the hospital room to clear before talking about the shooting. The circuit court found that no questioning occurred before Lunzman advised Lewandowski of his *Miranda* rights. This finding is supported by the evidence. Uncoerced, voluntary, and spontaneous statements are not protected by *Miranda*. *See State v. Smith*, 1999 S.D. 83, ¶¶ 35-36, 599 N.W.2d 344, 352. The motion to suppress these initial statements was properly denied.

b. *Miranda* Waiver.

[¶23.] Lunzman fully informed Lewandowski of his *Miranda* rights at the hospital and at the jail. The explanation included a statement that Lewandowski had a continuing "right to remain silent and stop questioning at any time" and that he had a continuing "right to consult with and have the presence of an attorney." Lewandowski affirmatively acknowledged at the hospital and jail that he understood these rights.

[¶24.] After Lewandowski acknowledged understanding the rights at the hospital, Lunzman reiterated the advisement, stating: "I would like to ask you some questions about what happened tonight. And again, remember your *Miranda*. You don't have to, but I would like to see what your side of this story is." Lunzman did not ask if Lewandowski wanted to waive his rights, but Lewandowski began answering all of Lunzman's questions. The questioning was conducted in a

conversational tone and Lewandowski expressed no concern or reservation about answering the questions. The circuit court determined that, "while there is no specific waiver of the rights, [Lewandowski] indicated that he knew the rights and continued to answer questions for Agent Lunzman."

[¶25.] Lewandowski argues that the circuit court failed to adequately consider his intoxication and impaired mental state in its waiver determination.

> The test of voluntariness of one who claims intoxication at the time of waiving his rights . . . is whether the individual was of sufficient mental capacity to know what he was saying—capable of realizing the meaning of his statement—and that he was not suffering from any hallucinations or delusions.

*State v. Strozier*, 2013 S.D. 53, ¶ 19, 834 N.W.2d 857, 863 (*Coon v. Weber*, 2002 S.D. 48, ¶ 18, 644 N.W.2d 638, 645) (affirming the circuit court determination that a defendant had voluntarily waived his *Miranda* rights where a defendant had a .214 BAC, but the record showed the defendant was not suffering from delusions and understood what he was saying). The circuit court found that Lewandowski was under the influence of alcohol at the time of questioning, but determined that Lewandowski's voluntary intoxication did not prevent him from knowingly and voluntarily waiving his rights. The record of the interrogation shows that Lewandowski lucidly recalled details and specific facts related to the shooting and events before and after the shooting. Lewandowski's behavior and actions throughout the interrogation indicate he understood what he was saying and desired to speak with Lunzman.

[¶26.] Lewandowski also claims he had been previously treated for mental health issues, and suggests that he may have been under the influence of

medication at the time of questioning. However, there is no evidence showing Lewandowski had taken any psychoactive drugs on the night of the shooting, other than alcohol. There is also no evidence that Lewandowski was suffering from any mental health issues or other mental impairment at the time of the interrogation.*

[¶27.]     Finally, the circuit court specifically determined that Lewandowski's will was not overborne in making the decision to answer Lunzman's questions. This determination is supported by the record showing that the questioning was non-coercive and conversational. Further, Lewandowski was previously acquainted with Lunzman and showed no reluctance in answering any of Lunzman's questions. Under the totality of the circumstances, Lunzman properly inferred that Lewandowski had waived his *Miranda* rights and wished to speak with him at the hospital and jail.

c.     Request for Counsel.

[¶28.]     Lewandowski also argues that when the questioning began at the jail he invoked his right to an attorney by asking, "[w]hat, worthless attorney am I gonna get appointed" immediately after Lunzman read him his *Miranda* rights for a second time. Lewandowski contends that Lunzman should have stopped the questioning at that time, or at a minimum, clarified the statement to determine if Lewandowski was requesting an attorney. The State argues Lewandowski's statement was too vague to be a request for counsel and it was unnecessary for

---

* Lewandowski requested and obtained a mental health evaluation during the proceedings, but neither the report nor any findings from the report were introduced by Lewandowski during the pretrial proceedings or at trial. After receiving the reports, Lewandowski withdrew his insanity pleas to the charges.

Lunzman to clarify the comment because Lewandowski had already waived his *Miranda* rights.

[¶29.] "[A] person subjected to custodial interrogation must invoke the right to counsel 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Tuttle*, 2002 S.D. 94, ¶ 13, 650 N.W.2d at 28 (quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994)). "If the accused's request for a lawyer is ambiguous or equivocal at the time *Miranda* rights are given, the officers must clarify the request and/or waiver before proceeding." *Blackburn*, 2009 S.D. 37, ¶ 9, 766 N.W.2d at 181. However, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect *clearly* requests an attorney." *Id.* ¶ 11, 766 N.W.2d at 182 (quoting *Davis*, 512 U.S. at 461, 114 S. Ct. at 2350) (emphasis added); *see also Maryland v. Shatzer*, 559 U.S. 98, 110, 130 S. Ct. 1213, 1223, 175 L. Ed. 2d 1045 (2010); *Berghuis*, 560 U.S. at 386, 130 S. Ct. at 2263. We have previously explained that once *Miranda* rights are waived, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Blackburn*, 2009 S.D. 37, ¶ 11, 766 N.W.2d at 182 (quoting *Davis*, 512 U.S. at 459, 114 S. Ct. at 2350).

[¶30.] Lewandowski's comment at the jail was not a clear invocation of the right to counsel. *See generally United States v. Mohr*, 772 F.3d 1143 (8th Cir. 2014) (holding "I think I should get [a lawyer]" was not a sufficient invocation of the right

to counsel); *Davis*, 512 U.S. 452, 114 S. Ct. 2350 (holding the statement, "[m]aybe I should talk to a lawyer" was not a clear and unambiguous invocation of suspect's rights). It would not have been sufficiently clear to Lunzman that Lewandowski was asking for an attorney at that time.

[¶31.] The circuit court found the questioning at the jail was a continuation of the interrogation from the hospital and this finding is supported by the record. The evidence shows Lunzman was not finished with his questioning when the decision was made to transport Lewandowski to the jail and there is no indication that a significant amount of time passed between the time Lewandowski was transported from the hospital to the jail. Further, Lunzman's decision to again advise Lewandowski of his *Miranda* rights did not turn the questioning at the jail into a second interrogation. Because Lewandowski had previously waived his *Miranda* rights, Lunzman was not required to stop questioning or clarify Lewandowski's comment before continuing his interrogation.

[¶32.] Finally, we also conclude that there was substantial, independent evidence, apart from Lewandowski's statements, to support his convictions. "Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *State v. Stanga*, 2000 S.D. 129, ¶ 21, 617 N.W.2d 486, 491 (quoting *Rose v. Clark*, 478 U.S. 570, 579, 106 S. Ct. 3101, 3106, 92 L. Ed. 2d 460 (1986)).

[¶33.] Lewandowski admitted through his own trial testimony that he entered Jeremy's home and shot him in the head. The evidence against

Lewandowski also included testimony that Lewandowski separately confessed to his son and sister-in-law that he killed Jeremy. There was also eye-witness testimony from Leslie that Lewandowski aggressively entered the home, uninvited and unannounced, and immediately sought out Jeremy before shooting him in the head. In opening and closing statements, defense counsel admitted that Lewandowski killed Jeremy and was guilty of manslaughter, but claimed that Lewandowski lacked the premeditation to commit murder and the specific intent to commit the other offenses.

[¶34.] There was overwhelming, independent evidence to support each of Lewandowski's convictions. In light of the strength of other independently obtained evidence, Lewandowski's statements were not needed to establish the factual basis for his convictions. Therefore, the admission of the evidence was harmless error even if the statements had been unlawfully obtained.

> 2. *Whether the circuit court erred in denying Lewandowski's motion for specific performance of the plea agreement.*

[¶35.] Lewandowski argues that the circuit court erred in denying his motion for specific performance of a plea agreement with the State. He claims that the State improperly rescinded the agreement after the victim's family objected to the terms. The State argues that the parties had not reached a meeting of the minds as to all the essential terms of the plea agreement and therefore a valid contract was not formed.

[¶36.] "Generally, plea agreements are contractual in nature and are governed by ordinary contract principles." *Waldner*, 2005 S.D. 11, ¶ 8, 692 N.W.2d at 190 (quoting *State v. Stevenson*, 2002 S.D. 120, ¶ 9, 652 N.W.2d 735, 738). This

Court has recognized the right of a defendant to enforce a plea agreement by specific performance after a plea has been entered. *See State v. Morrison*, 2008 S.D. 116, ¶ 5, 759 N.W.2d 118, 120 (explaining that once a defendant has given up his "bargaining chip" by pleading guilty, due process requires the defendant's expectations arising from a plea agreement or promise of the state to be fulfilled); *Vanden Hoek v. Weber*, 2006 S.D. 102, ¶ 13, 724 N.W.2d 858, 862 (holding the State breached a plea agreement at sentencing and explaining "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." (quoting *Santobello v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 499, 30 L. Ed. 2d 427 (1971))).

[¶37.]     Here, Lewandowski argues he was entitled to specific performance of the plea agreement before entering a plea of guilty. However, Lewandowski cites no authority for his claim that specific performance of a plea agreement is a proper remedy prior to entering a guilty plea. Further, we note that the rules of criminal procedure require the terms of a plea agreement to be placed on the record, along with any comments from the victim, and the sentencing court retains discretion to accept or reject a plea agreement reached by the parties. *See* SDCL 23A-7-8 to SDCL 23A-7-11. Finally, Lewandowski makes no claim that he detrimentally relied or acted upon any alleged promise made by the State in this case.

[¶38.]     Assuming, without deciding, that Lewandowski could obtain specific performance of a plea agreement before entering a guilty plea, Lewandowski has failed to show that a plea agreement was reached between the parties at the time of

the motion. In considering Lewandowski's claim, the circuit court was left to piece through unsworn, contested statements from counsel about the discussions during a phone call. Moreover, defense counsel did not dispute the State's Attorney's recollection that there was no agreement that Lewandowski would plead guilty to the charge of commission of a felony while armed, a term that the State claimed was essential to the plea agreement. When the court asked Lewandowski's counsel about the scope of his acceptance of the plea agreement, he indicated that he had agreed during the phone call that his client would agree to plead guilty to "manslaughter in the first degree, burglary and the aggravated eluding" charges, but acknowledged he had not committed his client would plead guilty to the firearm charge. Defense counsel also did not dispute the claim of the State's Attorney that any plea agreement was subject to the approval of the victim's family.

[¶39.]	Because Lewandowski has failed to show an enforceable plea agreement existed, we affirm the circuit court's decision denying the motion for specific performance of the plea agreement.

[¶40.]	GILBERTSON, Chief Justice, and KERN and SALTER, Justices, concur.