#28433, #28434-a-JMK
**2019 S.D. 17**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

  v.

GREGORY DEJESUS TWO HEARTS            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE TONY L. PORTRA
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General            Attorneys for plaintiff and
Pierre, South Dakota                  appellee.


JERALD M. McNEARY, JR. of
Gerdes & McNeary, P.C.                Attorneys for defendant
Aberdeen, South Dakota               and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
NOVEMBER 12, 2018
OPINION FILED **03/20/19**

KERN, Justice

[¶1.] Gregory Two Hearts appeals convictions for first-degree robbery and aiding, abetting, or advising first-degree robbery stemming from two separate cases. He asserts the circuit court erred by denying his motions to dismiss the indictments for a violation of his right to a speedy trial and for failing to grant his motion to suppress his statements to law enforcement. We affirm.

## Facts and Procedural History

[¶2.] On January 19, 2015, three men robbed the Casino Korner in Aberdeen, South Dakota and then fled avoiding arrest. The suspects evaded the police for months.[1] A second robbery occurred at the Sooper Stop gas station in Aberdeen on March 13, 2015. Following a lead on March 18, police arrived at the Ramkota Hotel where Two Hearts was staying to question him about the robbery. An armed standoff ensued, during which Two Hearts alleged that he attempted suicide via methamphetamine overdose. Two Hearts was arrested and held briefly at the Brown County Jail. On March 19, he was transported to the South Dakota State Penitentiary for an unrelated parole violation.

[¶3.] Almost immediately after his arrival at the penitentiary, Two Hearts began engaging in self-harming behavior. From March 19 through March 26, he was periodically placed in protective restraints to prevent him from harming himself. As indicated by prison medical records, staff responded to his behavior by treating him with a combination of three different medications—Haldol, Ativan,

---

1. Eventually, law enforcement arrested Roger Kihega and Michael Washington, the other two suspects involved in the Casino Korner robbery.

and Benadryl—intermittently between March 19 and early April.[2] Nevertheless, he continued to threaten to harm himself, picked at his self-inflicted wounds, and cut his arms when not restrained.

[¶4.]    On March 24, Two Hearts asked his parole officer to contact law enforcement and arrange an interview for him. Detectives interviewed him on March 25 and again on March 31. In each interview, he was advised of his *Miranda* rights. During the interviews, Two Hearts admitted involvement in the robberies and provided detailed information.

[¶5.]    On April 7, 2015, a grand jury indicted Two Hearts for first-degree robbery of Sooper Stop. He was also charged in a joint indictment with co-defendants Roger Kihega and Michael Washington for aiding, abetting, or advising first-degree robbery of Casino Korner. Two Hearts made his initial appearance on both indictments on June 22, 2015. He was arraigned on the charges on August 6, 2015, and part II informations were filed in each case, charging Two Hearts as a habitual offender. The two cases were assigned to different judges.

[¶6.]    The Casino Korner case against Two Hearts, Kihega, and Washington was set for jury trial on September 16, 2015. In August, the judge assigned to the Casino Korner robbery severed Two Hearts from the joint indictment at Kihega's request. Kihega retained the September 16 trial date. Between August and

---

2.    Haldol, Ativan, and Benadryl, according to the State's expert psychiatrist Dr. Hartley Alsgaard, all have sedative side effects. Haldol was originally marketed as an antipsychotic. Ativan is a sedative from the Valium family and used to temper alcohol withdrawal. Dr. Alsgaard explained the combination of Haldol and Ativan are sometimes used to calm a patient exhibiting symptoms similar to those exhibited by Two Hearts.

December 2015, the State attempted to schedule both of Two Hearts's trials with defense counsel to no avail. On January 9, 2016, Two Hearts moved to dismiss each case with prejudice, alleging the State violated the 180-day rule because 212 days had passed since his initial appearance. At a hearing on January 15, the circuit court denied Two Hearts's motion, concluding that the 180-day period was tolled from November 17, 2015, to January 20, 2016. January 20 had been set as Two Hearts's new trial date on the Casino Korner case. Two Hearts then moved for a continuance, which the court granted.

[¶7.]      On July 15, 2016, Two Hearts moved to suppress his statements to law enforcement from consideration in either case. At a hearing on the motion, the court heard testimony from Detective Neil of the Aberdeen Police Department, the State's expert Dr. Hartley Alsgaard of the South Dakota Human Services Center, and Two Hearts's expert psychiatrist Dr. Sarah Flynn from Avera University Psychiatry Associates. Detective Neil testified that Two Hearts remained alert and appropriately responded to questioning during each interview. Dr. Alsgaard, after listening to the recordings of the interviews, opined that Two Hearts was cognizant of his surroundings and the content of the interview questions. In contrast, Dr. Flynn testified that Two Hearts was incapable of making voluntary statements due to his fragile mental state, prior physical restraints, sedation, and withdrawal from drugs and alcohol. The court took the matter under advisement and later issued a memorandum decision denying Two Hearts's motion to suppress.

[¶8.]      Both of Two Hearts's trials resulted in guilty verdicts. On August 16, 2017, Two Hearts entered an admission to the habitual offender information in the

Casino Korner case pursuant to a plea bargain with the State.[3]  The circuit court
sentenced him to serve 25 years in prison for each offense with the sentences to run
consecutively.

[¶9.]       Two Hearts appeals each conviction.[4]  Because his claims of error
involve nearly identical facts and legal arguments, we consolidated his appeals and
restate his issues as follows:

> 1.  *Whether the circuit court erred by denying Two Hearts's
>     motion to dismiss for violation of his statutory right to
>     trial within 180 days and his constitutional right to a
>     speedy trial.*
>
> 2.  *Whether the circuit court erred in denying Two Hearts's
>     motions to suppress.*

**Decision**

***Statutory right to a speedy trial***

[¶10.]      Two Hearts argues the circuit court erred when it denied his motions
to dismiss both indictments for violating the 180-day rule and his constitutional
right to a speedy trial in both cases.  The "180-day rule" is a rule of procedure, not a

---

3.     The State filed habitual offender informations against Two Hearts in each
       case, pursuant to SDCL 22-7-8, alleging he had been convicted of three or
       more prior felonies including one or more crimes of violence.  If convicted as a
       habitual offender in the Casino Korner case, Two Hearts's sentence for aiding
       and abetting a robbery, a Class two felony, would have been enhanced two
       levels to a Class C felony, increasing the maximum possible penalty from 25
       years and/or a $50,000 fine to up to life imprisonment and/or a $50,000 fine.
       *See* SDCL 22-7-8; SDCL 22-6-1(3).  Two Hearts ultimately entered into a plea
       agreement admitting to just one of the prior felonies.  This admission limited
       his potential maximum sentence from life in prison to the penalty for a Class
       one felony which is up to 50 years in the penitentiary and/or a $50,000 fine.
       SDCL 22-7-7; SDCL 22-6-1(4).

4.     Counsel on appeal was not trial counsel.

constitutional requirement and, therefore, requires a separate analysis. *Hays v. Weber*, 2002 S.D. 59, ¶ 16, 645 N.W.2d 591, 596. Pursuant to SDCL 23A-44-5.1, a defendant must be brought to trial within 180 days from the date the defendant first appeared before any "judicial officer on an indictment, information or complaint." *State v. Andrews*, 2009 S.D. 41, ¶ 7, 787 N.W.2d 181, 183. Certain days are properly excluded from this calculation, including "delay which is occasioned by the defendant's conduct, such as delay caused by pretrial motions . . . [and] defendant's competency examination . . . ." *State v. Webb*, 539 N.W.2d 92, 95 (S.D. 1995); SDCL 23A-44-5.1(4)(a)-(f).

[¶11.]      Additionally, the court may find good cause for delay for other exceptional circumstances, not specifically enumerated in the rule. SDCL 23A-44-5.1(4)(g). The burden is on the prosecution to establish the existence of good cause for delay. *See* SDCL 23A-44-5.1(5); *see also State v. Cooper*, 421 N.W.2d 67, 71 (S.D. 1988). If the defendant is not brought to trial within 180 days, accounting for any properly excluded days, prejudice to the defendant is presumed and the case shall be dismissed unless the prosecuting attorney successfully rebuts the presumption of prejudice. SDCL 23A-44-5.1(5).

[¶12.]      "A circuit court's findings of fact on the issue of the 180-day rule are reviewed using the clearly erroneous rule." *State v. Seaboy*, 2007 S.D. 24, ¶ 6, 729 N.W.2d 370, 372. However, "[w]e review . . . whether the 180[-]day period has expired as well as what constitutes good cause for delay under a de novo standard." *Andrews,* 2009 S.D. 41, ¶ 6 n.1, 767 N.W.2d at 183 n.1. Because Two Hearts's

initial appearances for each case occurred on the same day, we address Two

Hearts's allegations together.

[¶13.]       A brief chronology of the events following Two Hearts's initial

appearances is set forth below:

6/22/15:       Initial appearance on both cases.

8/6/15:        Arraignment on both cases. The court ordered the parties
               to develop a scheduling order for the Sooper Stop robbery.

8/7/15:        The State provided a proposed scheduling order to Two
               Hearts but received no response.

8/14/15:       The State requested a November 17, 2015 trial date.

8/17/15:       Defense was notified that this date worked for the court
               and the State. The State followed up on the proposed
               scheduling order two days later via e-mail but received no
               response.

8/20/15:       The charges against Two Hearts for the Casino Korner
               robbery were severed from the joint indictment.

8/25/15:       The State inquired about a proposed trial date for the
               Sooper Stop trial but received no response.

9/2/15:        Defense agreed to the November trial date, but by then,
               only back-up dates were available. Defense counsel
               acknowledged that once he hired an assistant, his
               scheduling practices would get better.

9/7/15:        Defense requests one judge be assigned to both criminal
               files. The request was granted on September 8.

10/1/15:       The State e-mailed the court administrator and defense
               counsel to set jury trials in both cases but received no
               response from the defense.

10/27/15:      The State followed up on an October 1 e-mail to the court
               administrator and defense counsel.

11/3/15:       The State e-mailed both defense counsel and the court
               administrator to schedule the trials. Back-up dates were

available for December. The State refused the back-up dates due to the 180-day rule.

11/18/15: The State attempted to schedule the trial with defense counsel. No response was received. The State scheduled a status hearing for December 17, 2015.

1/9/16: Two Hearts filed a motion to dismiss with prejudice alleging violation of the 180-day rule.

1/15/16: A hearing was held on the motion to dismiss and the State's motion for tolling the 180-day rule. The court denied Two Hearts's motion, finding good cause for the delay. At the same hearing, Two Hearts moved for a continuance of his January 20, 2016 Casino Korner jury trial in order to work with an investigator and a forensic psychiatrist appointed to assist him with his case. The court granted the motion and tolled the 180-day period from January 15, 2016, to August 9, 2016.

7/15/16: Two Hearts filed a motion to suppress. On July 17, 2016, the court issued an order tolling the 180-day period from July 18, 2016, to December 27, 2016, while the motion was pending.

8/9/16: Two Hearts's trials were continued pending hearing on his motion to suppress.

1/27/17: The court held the suppression hearing and took the matter under advisement. It tolled the 180-day period from December 27, 2016, until "the new trial date."

6/8/17: The court issued a memorandum opinion denying Two Hearts's motion to suppress.

6/27/17: Two Hearts's Sooper Stop trial began.

8/14/17: Two Hearts's Casino Korner trial began.

9/28/17: The court held a motion and sentencing hearing at which it clarified for the record that it was excluding November 17, 2015, to January 20, 2016, from the 180-day period.

[¶14.]    Neither party disputes that more than 180 days passed between Two

Hearts's initial appearance and his trial dates. Rather, the parties disagree about

whether there was good cause for the delays. Two Hearts contends the State "made zero attempts to schedule Two Heart[s's] trials within th[e] 45[-]day period" between his initial appearance and his arraignment. Two Hearts takes no responsibility for the delays, arguing that the State finally attempted to schedule the trial only after his arraignment on August 6, 2015.[5] He also contends "there is absolutely no finding or indication in the record attributing the delay to the joined indictment."[6] As for the delay resulting from his request for reassignment of his cases to a single judge, Two Hearts stresses that the circuit court failed to make a particularized finding regarding the specific period of delay attributed to the reassignment, and at most, correcting the error took only one day. Regardless, he asserts that scheduling delays must be attributed to the State. He further asserts that court congestion caused the delay, which is not an excuse for tolling.

[¶15.] In response, the State argues exceptional circumstances caused the delay, including: (1) time spent resolving Two Hearts's pre-trial motions; (2) the severance of co-defendants from the joint indictment; (3) Two Hearts's request to

---

5. Further, he argues his failure to respond to the State's August 7, 2015 scheduling order is immaterial because the order became irrelevant when the court severed the charges against Two Hearts for the Casino Korner robbery from the joint indictment.

6. Additionally, Two Hearts argues the plain language of SDCL 23A-44-5.1(e) does not support tolling while Kihega's severance motion was pending. He argues SDCL 23A-44-5.1(e) allows for delay only "when the defendant is *joined* for trial with a codefendant . . ." rather than permitting a delay for severance. *Id.* (emphasis added). He also emphasizes that he neither filed the severance motion nor stipulated to it.

assign a single judge to hear both cases; and (4) Two Hearts's failure to respond to scheduling requests.

[¶16.]     We have observed that "where a defendant assents to a period of delay and later attempts to take advantage of it, courts should be loathe [sic] to find a violation of an accused's speedy trial rights." *State v. Cottrill*, 2003 S.D. 38, ¶ 11, 660 N.W.2d 624, 630.  Based on our review of the record, there is little doubt that the defense did just that.  The 180-day period began on June 22, 2015, when Two Hearts made his first appearance before a judicial officer on both criminal files.  Starting on August 7, 2015, and continuing throughout November 2015, the State made numerous attempts via e-mail to schedule a trial with defense counsel to no avail.  Two Hearts acknowledges that he did not immediately respond to the State's August 17 request that trial be scheduled for mid-November.  The record also reveals that the State scheduled two status hearings to attempt to schedule a trial because of scheduling difficulties attributable to Two Hearts.  Further, throughout 2016, Two Hearts requested continuances three times: once for a mental evaluation and twice during the pendency of his motion to suppress.

[¶17.]     The circuit court excluded November 17, 2015, to January 20, 2016, from the calculation.  Every delay thereafter is squarely attributed to Two Hearts and properly excluded under the provisions of SDCL 23A-44-5.1.  The State is not responsible for delays resulting from Two Hearts's continuances or periods in which his motions were pending.  *See Cottrill*, 2003 S.D. 38, ¶ 7, 660 N.W.2d at 628-29.  Considering the periods not excused by the circuit court—June 22, 2015, to November 17, 2015—only 147 days lapsed, placing his trial dates well within the

180-day rule. The circuit court did not err in finding good cause existed for the delays in the case.

***Constitutional right to a speedy trial***

[¶18.]     Two Hearts also alleges a violation of his constitutional right to a speedy trial in each case. *See* U.S. Const. amend. VI; S.D. Const. art. VI § 7. To determine whether his Sixth Amendment right was violated, we evaluate: "(1) [t]he length of the delay; (2) the reason for the delay; (3) whether the accused asserted the right for a speedy trial; and (4) whether the accused was prejudiced by the delay." *State v. Karlen*, 1999 S.D. 12, ¶ 18, 589 N.W.2d 594, 599. "Delays of over a year are presumptively prejudicial; delays of less than one year are not." *State v. Tiegen*, 2008 S.D. 6, ¶ 16, 744 N.W.2d 578, 585. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors . . . ." *State v. Holiday*, 335 N.W.2d 332, 334–35 (S.D. 1983).

[¶19.]     Two Hearts argues the State's delay in bringing his cases to trial is presumptively prejudicial because his proceedings were delayed more than a year. Twenty-seven months separated his arrest and pre-trial detention from the Sooper Stop trial and twenty-nine months lapsed before his trial for the Casino Korner robbery. What Two Hearts fails to acknowledge, however, is the role his own actions played in delaying the trials beyond one year. *See Cottrill*, 2003 S.D. 38, ¶ 11, 660 N.W.2d at 630 (holding that we will not find a violation of a defendant's right to a speedy trial when the defendant assents to a period of delay). In reviewing the progress of the cases overall, less than five months of the delay is attributable to the State. The remaining delays occurred because Two Hearts

moved to suppress his confessions and requested three continuances in 2016. Because most of the delay occurred at Two Hearts's request, he has failed to show he was prejudiced by the delays in either case. Thus, the circuit court did not err by denying Two Hearts's motions to dismiss the indictments.

### Two Hearts's motions to suppress

[¶20.] Two Hearts raises three claims in support of his argument that the circuit court erred by failing to suppress his statements given to detectives who interviewed him at the penitentiary on March 25 and 31, 2015. He argues that 1) he did not validly waive his *Miranda* rights, 2) his confession was involuntary, and 3) his invocations of his right to counsel were ignored.

  1. *Miranda* waiver

[¶21.] Two Hearts argues that he could not knowingly and intelligently waive his *Miranda* rights because he was under "extreme psychological pressure" at the time of the interviews. "[W]e review *de novo* a [circuit] court's ruling on the question whether a defendant knowingly, intelligently, and voluntarily waived *Miranda* rights." *State v. Tuttle,* 2002 S.D. 94, ¶ 6, 650 N.W.2d 20, 25. "When a person is in the custody of law enforcement and law enforcement intends to perform a custodial interrogation of that person, they are required to read them their *Miranda* rights." *State v. Lewandowski*, 2019 S.D. 2, ¶ 20, 921 N.W.2d 915, 920. A waiver need not be explicit, but "[t]o prove a valid waiver, the State must show that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them." *Tuttle,* 2002 S.D. 94, ¶ 9, 650 N.W.2d at 26. The

State must prove the validity of the waiver by a preponderance of the evidence. *Id*. ¶ 8.

[¶22.] A court examines the totality of the circumstances when considering whether a valid waiver has taken place, such as "a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition." *Lewandowski*, 2019 S.D. 2, ¶ 21, 921 N.W.2d at 921. A waiver may be inferred from the defendant's understanding of the rights coupled with "a course of conduct reflecting a desire to give up those rights." *State v. Diaz*, 2014 S.D. 27, ¶ 47, 847 N.W.2d 144, 160.

[¶23.] After Detective Neal read Two Hearts the *Miranda* warnings on March 25, he asked if Two Hearts understood his rights, to which Two Hearts replied, "Yes." The interview continued:

> **Detective Neal**: Alright. Do you wish to waive those rights and speak with me about this stuff?
>
> **Two Hearts**: About what stuff?

[¶24.] Detective Neal did not obtain an explicit *Miranda* waiver. However, an explicit waiver was not necessary. Two Hearts's behavior by requesting the interview, stating that he understood his rights, and then engaging continuously with law enforcement during the interview indicates that he voluntarily relinquished his rights and was fully aware of the consequences of waiving his *Miranda* rights. Regarding the March 31 interview, after detectives advised him of his *Miranda* rights, he clearly confirmed his willingness to talk to the detectives prior to questioning. Additionally, for the reasons stated below regarding the voluntariness of his confessions, Two Hearts was not experiencing such

"psychological pressure" that would render either waiver involuntary. The circuit court did not err when it concluded that Two Hearts had validly waived his *Miranda* rights.

    2.  Voluntariness of confession

[¶25.]        Two Hearts alleges that he "did not give a voluntary and knowing confession to the interrogators." He points to many circumstances surrounding his interviews on March 25 and 31 in support of his argument, including: he was experiencing methamphetamine and alcohol withdrawal, he was pharmacologically restrained, he was experiencing psychological pressure and restraint, he was offered false promises of leniency, and the detectives interviewing him utilized false statements and psychological tactics.

[¶26.]        When asked to review the voluntariness of a confession, "we 'examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" *Tuttle*, 2002 S.D. 94, ¶ 20, 650 N.W.2d at 31. "The State must establish the voluntariness of a confession by a preponderance of the evidence." *State v. Holman*, 2006 S.D. 82, ¶ 13, 721 N.W.2d 452, 456. The totality of the circumstances test is utilized when assessing the question of whether a confession was voluntary. *Tuttle*, 2002 S.D. 95, ¶ 22, 650 N.W.2d at 31. The ultimate determination is whether, "in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will . . . when interrogation tactics and statements are so manipulative or coercive as to deprive a defendant of the ability to make an unconstrained, autonomous decision to confess." *State v. Fisher*, 2011 S.D. 74, ¶ 19, 805 N.W.2d 571, 576 (internal quotation marks omitted).

[¶27.]        "The factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure." *Holman*, 2006 S.D. 82, ¶ 15, 721 N.W.2d at 456. "[C]oercion or improper conduct of law enforcement must be a *direct cause* of the confession." *Id.* ¶ 15, 721 N.W.2d at 457 (emphasis added). When weighing the second factor, we consider, among other things, the defendant's age, educational level, whether the defendant was advised of his constitutional rights, the timeframe of the detention, deprivation of food or sleep, and whether the questioning was prolonged or repetitive. *Id* ¶ 15, 721 N.W.2d at 456. The defendant's previous experience with the judicial system and law enforcement is also relevant. *Id.*

### a. Methamphetamine and alcohol withdrawal

[¶28.]        First, Two Hearts maintains that his methamphetamine and alcohol withdrawal affected the voluntariness of his statements. He relies heavily on the opinion of his expert to support his argument. Dr. Flynn interviewed Two Hearts and reviewed Two Hearts's records, including the audio tape and transcript of his interviews. Dr. Flynn opined at the suppression hearing that Two Hearts was suffering from methamphetamine withdrawal at the time of the two law enforcement interviews. Dr. Flynn noted that although the prison staff failed to consistently chart Two Hearts's vital signs during the first few days of custody, Two Hearts exhibited an elevated score on the Department of Health Correctional Health Care Amphetamine Withdrawal Assessment Flow Sheet.[7] Dr. Flynn also

---

7.        The Amphetamine Withdrawal Assessment Flow Sheet is a standard document kept in evaluating methamphetamine or amphetamine

(continued . . .)

explained that during Two Hearts's March 25 interview, he struggled to keep his train of thought.[8] However, she agreed Two Hearts was not delirious during either interview and was more lucid during the March 31 interview.

[¶29.] In response, the State called Dr. Alsgaard who testified that because Two Hearts was incarcerated on March 19, his withdrawal ended days prior to the first interview on March 25. In Dr. Alsgaard's opinion, persons withdrawing from amphetamines, but not in a state of delirium, can make voluntary statements unless they are suffering from an amphetamine psychosis. According to Dr. Alsgaard, Two Hearts never appeared to be delirious.

[¶30.] From our review of the entire record, there is little evidence to suggest that Two Hearts's withdrawal symptoms had an impact on either confession. The audio tapes and transcripts of the March 25 interview reveal that Two Hearts did not appear confused about the nature of the interview or the consequences of speaking with law enforcement. The interview lasted about three hours and was conversational in tone. Two Hearts accurately described the reason he was restrained and remained skeptical that the detectives could assist him in obtaining a lighter sentence. He actively questioned the detectives to determine what

_____

(. . . continued)
      withdrawal. It assigns patients a score depending on their withdrawal symptoms.

8.    When Dr. Flynn initially reviewed the recording of the March 25 interview, she diagnosed Two Hearts as delirious. During her testimony, however, she admitted that her opinion was affected by the poor quality of the audio recording. After she reviewed the transcript with the audio, she changed her opinion, concluding that Two Hearts was withdrawing from alcohol and methamphetamine but was not delirious.

information they had on him. At one point, Two Hearts requested that the detectives turn off the tape recorder and remove the batteries, citing concerns for his family's safety if he disclosed names of other defendants involved. He also bargained with detectives for the privilege of calling his mother and spouse in exchange for his statements and could accurately recall their phone numbers.

[¶31.] Importantly, Two Hearts was able to coherently recall the details of the Sooper Stop robbery when he confessed to it during the March 25 interview. He described what he wore that night, the reaction of the store clerk to his demands, and how much money he obtained. Likewise, in the March 31 interview, Two Hearts provided clear and detailed statements regarding his criminal involvement in the Casino Korner robbery. He described his relationship with his co-defendants, admitted that he was the driver of the get-away vehicle, provided details about how he picked up and dropped off his co-defendants, where they went after the robbery, and his share of the money taken from Casino Korner.

### b. Pharmacological restraints

[¶32.] Two Hearts maintains that being under the influence of drugs administered by medical staff at the penitentiary destroyed his ability to voluntarily confess. He centers his argument on Dr. Alsgaard's statement that a prisoner, if under the influence of enough sedatives, might be incapable of voluntarily confessing. Although portions of the prison medical records are difficult to read, it appears prison medical staff administered the sedatives late at night or in the early morning hours before the March 25 interview. Dr. Alsgaard testified that sedatives typically remain in a patient's system for 12 to 14 hours. Therefore,

at the time of the interview at 11:47 a.m., the effects of the medication were undoubtedly waning. Critically, despite the sedating effects of these medications, Two Hearts was alert and coherent during both interviews.

### c. *Psychological pressure and restraints*

[¶33.]     Next, Two Hearts argues he suffered "psychological pressure or physical punishment" because he was placed in restraints from March 19 to March 26 due to his suicide attempts. *See Tuttle*, 2002 S.D. 94, ¶ 22, 605 N.W.2d at 31. On March 24, while unrestrained, he engaged in self-harming behaviors, including sticking a pencil and razor blade into his arm. He emphasizes that he was "almost constantly" in 3-, 4-, or 5-point restraints during the days immediately prior to his first interview.[9] To further substantiate his claim that the restraints impacted the voluntariness of his confession, Two Hearts highlights his attempt to negotiate his release from future restraints with detectives at the end of the March 25 interview. In response, the State submits that prison staff restrained Two Hearts prior to the March 25 interview not to torture or coerce him, but rather to protect him from himself.

[¶34.]     While Two Hearts experienced a psychiatric emergency that involved self-harm the day prior to his first interview, causing prison staff to place him in

---

9.     Two Hearts also alleges he was denied food and toilet facilities prior to the interview rendering his statements involuntary. *See State v. Darby*, 1996 S.D. 127, ¶ 29, 556 N.W.2d 311, 319-20. The documents in his medical file are unclear and do not record whether he used the bathroom or ate during the period of restraint leading up to the interview. Because Two Hearts received food, beverages, and bathroom breaks during the interview the circuit court found his claims "simply false."

physical restraints, no evidence suggests that the staff did so as a mechanism for punishment or coercion. Instead, staff restricted his movements to prevent future suicide attempts. Ultimately, it was Two Hearts's decision to initiate the interviews by requesting to speak with detectives. Although several individuals—two prison staff members and two or three detectives—were present during the interviews, communication between Two Hearts and the detectives remained friendly and conversational, and Two Hearts, at these times, was calm and contained. Moreover, during the interviews, he wore only handcuffs. Regarding the March 31 interview, both Dr. Flynn and Dr. Alsgaard agreed that Two Hearts's confession was voluntarily given. By March 31, the date of the final interview, Two Hearts resided in segregated housing and was no longer in restraints.

### d. False promises of leniency

[¶35.]        Two Hearts further claims that false promises of leniency from the detectives and prosecutor overbore his will, resulting in an involuntary confession. Detectives are "authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise." *Holman*, 2006 S.D. 82, ¶ 24, 721 N.W.2d at 458. However, false statements or tricks used to obtain a confession will not render a confession per se inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1425, 22 L. Ed. 2d 684 (1969); *see also Hutto v. Ross*, 429 U.S. 28, 29, 97 S. Ct. 202, 203, 50 L. Ed. 2d 194 (1976). "[E]ven with police coercion, a confession cannot be held to have been

*obtained* by the exertion of such improper influence, unless it is the direct cause for the confession." *Tuttle*, 2002 S.D. 94, ¶ 23, 650 N.W.2d at 31.

[¶36.]     It is undisputed that the detectives offered Two Hearts leniency as a strategy to encourage his cooperation. The following exchange from the March 25 interview is but one example of the assurances detectives made Two Hearts:

> **Two Hearts**: You can guarantee . . . that they are not going to give me no habitual? Is that what you are going to guarantee me?
>
> **Detective Gross**: No habitual. I promise you that. I give you my word man.

Following this dialogue, Two Hearts had a phone conversation with the prosecutor to confirm the detectives' offer to forego his habitual offender status. The audio recording of the conversation is of poor quality. Because some of the prosecutor's statements are inaudible, we, like the circuit court, are not certain of the nature of the prosecutor's discussion with Two Hearts or the details of the alleged leniency offer.[10]

[¶37.]     Two Hearts, relying on our decision in *Holman*, argues that the promise of leniency was impermissible. In *Holman*, the defendant remained uncooperative with law enforcement until the State made false promises of leniency. Because the State's misrepresentation "directly resulted in Holman's involuntary

---

10.    The record does not include conclusive information regarding the nature of the prosecutor's statements during the phone conversation. Detective Neil, the detective present at both interviews, was the only interviewer to testify at the suppression hearing. He made only general comments with respect to the nature of Two Hearts's conversation with the prosecutor. For instance, he testified, "I believe . . . [S]ergeant Gross did offer him some deals through the state's attorney's office, yes."

confession[,]" we overturned the circuit court's denial of the defendant's motion to suppress. *Holman,* 2006 S.D. 82, ¶ 24, 721 N.W.2d at 458.

[¶38.] During the March 25 interview Two Hearts admitted to committing the Sooper Stop robbery before the detectives raised the possibility of dropping the habitual offender charge and before his phone conversation with the prosecutor. Thus, any alleged promises made during the conversation had no impact on his Sooper Stop confession.

[¶39.] The same may not be true for the Casino Korner robbery because Two Hearts only confessed to his involvement in that robbery during the March 31 interview, *after* the March 25 offers of leniency. While Two Hearts provided some information regarding the Casino Korner robbery on March 25 following the discussion with the prosecutor, he resolutely denied his involvement in the crime until well into the March 31 interview. Accordingly, we must determine whether, under the totality of the circumstances, Two Hearts's confession to that crime was obtained as a direct result of the State's promise to forgo charging him as a habitual offender.

[¶40.] During the March 25 interview, Two Hearts was highly skeptical of the detectives' promise that his habitual offender status would not be added to his charges. Indeed, because of his skepticism that the detectives' oral offer of leniency was not "legal," the officers initiated a phone conversation between Two Hearts and the prosecutor during the March 25 interview. Yet, after speaking with the prosecutor, Two Hearts remained cynical. He persisted in his refusal to give up the details of his criminal involvement in the Casino Korner robbery.

[¶41.] Two Hearts's skepticism continued into the March 31 interview. Moreover, during that interview, detectives told Two Hearts, prior to his eventual confession to his involvement in the Casino Korner robbery, that the habitual offender charge would not apply to the Sooper Stop robbery. They suggested that Two Hearts's cooperation might influence the prosecutor with reference to the Casino Korner case, but they could not "guarantee what [the prosecutor] would do with [Casino Korner]." They informed Two Hearts it was within the prosecutor's right to charge him as he saw fit. Two Hearts acknowledged that fact stating, "Yeah, that is life."

[¶42.] Upon consideration of the totality of the circumstances, Two Hearts's statements provide us with the necessary context to conclude that the initial offer of leniency likely involved a promise not to proceed on the habitual offender information in the Sooper Stop case. Furthermore, in its memorandum opinion, the circuit court noted that it allowed Two Hearts to introduce any additional evidence he may have indicating that the State had offered a plea agreement during the phone call and failed to abide by its terms. Two Hearts produced no further evidence on the matter.

[¶43.] Two Hearts's steadfast reluctance throughout both interviews establishes he was aware that his statements were both incriminating and might be used against him. Further, by continuously bartering for favors in exchange for his statements, Two Hearts did not behave as though the alleged promise induced his confession. *See Tuttle*, 2002 S.D. 94, ¶ 30, 650 N.W.2d at 35. Instead, his actions evince that he weighed the benefits and consequences of confessing and concluded

that speaking with law enforcement had immediate advantages. In exchange for his statements, Two Hearts requested food, beverages, phone conversations with loved ones, release from restraints, and police protection for his mother.

[¶44.] Additionally, Two Hearts's criminal background and education heightened his ability to resist pressure from law enforcement. At the time, Two Hearts was in his late thirties, had obtained a GED, and had extensive experience with the criminal justice system having previously been convicted of four felonies and three misdemeanors.[11] Upon review of all the circumstances involved, we conclude that Two Hearts's confession to the Casino Korner robbery was not a direct result of the State's leniency offer.

### e. False statements and psychological tactics

[¶45.] Two Hearts also contends that the detectives impermissibly lied about finding DNA evidence at Sooper Stop, which they stated was deposited when he touched the counter with his hands. The State submits that the use of the false statement was a permitted psychological tactic. *See Holman*, 2006 S.D. 82, ¶ 15, 721 N.W.2d at 456–57. "[D]eception or misrepresentation by the officer . . . may also be factors for the [circuit] court to consider;" however, the "improper conduct of law enforcement must be a direct cause of the confession." *Id.* Akin to the offers of leniency made during the interviews, there is no evidence that this misrepresentation resulted in Two Hearts's confession or "deprived [him] of his

---

11. Two Hearts was previously convicted of first degree robbery, third degree arson, distribution of marijuana to a minor, and conspiracy to commit third degree arson. He was incarcerated in the penitentiary from 1999–2013 and on parole at the time of the current offenses.

ability to make an unrestrained, autonomous decision to confess." *See State v. Smith*, 1999 S.D. 83, ¶ 36, 599 N.W.2d 344, 352.[12]

[¶46.] Upon consideration of the factors raised by Two Hearts, the circuit court did not err when it found "that the State has proven by preponderance of evidence that Defendant's statements . . . were voluntary, knowing, and intelligent."

　　　　3.　Invocation of right to counsel

[¶47.] Finally, we consider Two Hearts's claim that he invoked his right to an attorney but questioning did not cease. "If the accused's request for a lawyer is ambiguous or equivocal at the time *Miranda* rights are given, the officers must clarify the request and/or waiver before proceeding." *State v. Blackburn*, 2009 S.D. 37, ¶ 9, 766 N.W.2d 177, 181. After a voluntary waiver of *Miranda* rights, however, "law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* ¶ 11, 766 N.W.2d at 182. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

---

12.　Two Hearts also argues that even if his March 31 statements were voluntary, they should be suppressed under the fruit of the poisonous tree doctrine because the only intervening event between the interviews "was the passage of time." *See State v. Helmer*, 1996 S.D. 31, ¶ 32, 545 N.W.2d 471, 476 ("When preceding confessions or statements are inadmissible, subsequent statements are not automatically inadmissible, but they are suspect."). In light of our conclusion that the March 25 statements were voluntary, this argument also fails. Because no constitutional violation exists, Two Hearts cannot assert a factual nexus between a constitutional violation and the evidence he challenges, namely, the March 31 interview. *See State v. Heney*, 2013 S.D. 77, ¶ 11, 839 N.W.2d 558, 562.

[¶48.]    During both interviews, following the voluntary waiver of his *Miranda* rights, Two Hearts mentioned his possible need for an attorney several times to the detectives.  On March 25, following Two Hearts's confession to the Sooper Stop robbery, he asks the detectives, "Well can we come back and do this with a lawyer then?"  In reply, one of the detectives stated, "We can."  But the detectives continued with the interview.  Two Hearts did not suggest the need for an attorney again, continuing to provide the detectives with further information regarding the robberies.  We have determined that similar statements that merely raise the possibility of obtaining an attorney are equivocal for purposes of *Miranda*.  *State v. Wright*, 2009 S.D. 51, ¶¶ 28-29, 768 N.W.2d 512, 522-23 (defendant's question, "Do I need to call a lawyer," held to be equivocal); *State v. Aesoph*, 2002 S.D. 71, ¶ 23, 647 N.W.2d 743, 752-53 (defendant's statements "If you're accusing me here, maybe I should call my lawyer," and, "Maybe I should have an attorney," held to be equivocal).

[¶49.]    During the March 31 interview, Two Hearts made two possible references to obtaining an attorney, asking, "When am I going to be able to talk to a lawyer or get a lawyer or anything like that?"  Two Hearts was then informed of the procedure for obtaining a court-appointed attorney but did not express a clear desire to end questioning and obtain an attorney at that time.  However, near the end of the interview, following his confession to the Casino Korner robbery, he stated, "I think that is all I got to say at this point until I get a lawyer."  This was his clearest invocation of his intention to cease questioning until he was represented by counsel.  Despite this, the interview improperly continued.  However, due to the timing of

this request, any failure by the circuit court to exclude Two Hearts's post-invocation statements was harmless. Two Hearts had already fully confessed and the statements were unrelated to the robberies. *See State v. Bowker*, 2008 S.D. 61, ¶ 63, 754 N.W.2d 56, 75.

## Conclusion

[¶50.] The circuit court did not err by denying Two Hearts's motion to dismiss the indictments for violation of his statutory and constitutional rights to a speedy trial. Additionally, Two Hearts's waiver of *Miranda* rights and subsequent statements were voluntary, knowing, and intelligent. Finally, although Two Hearts invoked his right to an attorney, his unambiguous request occurred after he had confessed to both crimes. The error in continuing the interview after that point was, therefore, harmless. We affirm.

[¶51.] GILBERTSON, Chief Justice, and JENSEN and SALTER, Justices, concur.