#26400-a-SLZ

**2013 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

VIND MICHAEL STROZIER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBIN J. HOUWMAN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

BETHANY L. ERICKSON
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.


MOLLY C. QUINN of
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota               Attorneys for defendant
                                        and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MAY 20, 2013

OPINION FILED **07/10/13**

#26400

ZINTER, Justice

[¶1.] Vind Strozier was convicted of murder in the second degree and aggravated assault after stabbing two men during an altercation. Prior to trial, he moved to suppress his statements made during a custodial interrogation. The circuit court denied the motion. Strozier appeals the denial of the motion and his convictions. We affirm.

*Facts and Procedural History*

[¶2.] On August 13, 2011, Strozier was living in a motel in Sioux Falls. At approximately 7:30 p.m., he returned to the motel after work. After consuming alcoholic beverages, he joined two friends at a different motel. Later, while the three men were walking back to Strozier's motel, Strozier stopped at a gas station and then proceeded to rejoin his friends at his motel.

[¶3.] As Strozier approached his motel, he noticed that his friends were arguing with a group of seven people who he did not know. An altercation ensued between Strozier and two men in the group, later identified as Rodney Iron Hawk and Cory Thornton. Strozier was knocked to the ground, he got up, and he went to his motel room.

[¶4.] Strozier then returned to the scene of the altercation, where his two friends were still arguing with the group. Strozier had an opened knife and "swiped" at the men, fatally stabbing Iron Hawk. Thornton was cut on his arm.

[¶5.] Police officers arrived at the scene. Strozier was arrested, read his *Miranda* rights, placed in the back of a patrol car, and taken to the law enforcement center. Upon arriving at the center, two of the officers noted that Strozier was

emotional, upset, stressed, and he had urinated on himself. The officers further observed two bumps on his forehead and abrasions on his face, back, and shoulder. Strozier requested medical attention and was transported to a hospital.

[¶6.]     Shortly after midnight, a blood test at the hospital indicated that his blood-alcohol level was 0.214 percent. A physician diagnosed a non-serious closed-head injury,[1] facial contusions, and abrasions. Strozier was given one dose of pain medication and was taken back to the law enforcement center.

[¶7.]     At 1:30 a.m., Strozier was placed in an interrogation room. While waiting to be interviewed, he made several comments about pain from his head injury. At approximately 2:50 a.m., Detective Carda entered the room to begin the interrogation. Carda re-advised Strozier of his *Miranda* rights.[2] Strozier replied that he understood his rights and waived them.[3]

---

1.    The treating physician described a closed-head injury as "a head injury where you bump your head and your CAT scan of your brain is normal. You don't have any bleeding or anything very serious."

2.    Approximately thirty minutes into the interrogation, Strozier and Detective Carda left the room to use the restroom. When the interrogation resumed, Carda read Strozier his *Miranda* rights again. Strozier waived his rights at that time as well.

3.    After Carda read Strozier his *Miranda* rights, the following conversation took place:

> **Detective Carda:** . . . Do you understand these rights?
> **Strozier:** More than you think I know. I told you I've got a cousin who been police for thirty years.
> **Detective Carda:** How about a yes or a no?
> **Strozier:** Yes sir. Yes sir.
> **Detective Carda:** . . . Do you wish to waive these rights and talk to me at this time?
> **Strozier:** Yes I do.

[¶8.] During a two-hour interrogation, Strozier maintained a fairly consistent account of the incident, claiming that he acted in self-defense. He claimed that he had been beaten during the initial altercation.[4] He stated that he then went to his motel room and returned to the scene with an opened knife "in order to protect himself."[5] He acknowledged that he should not have returned. After Carda informed Strozier that Iron Hawk had died from his injuries, Strozier insisted that he had never meant to kill him. In the final minutes of the interrogation, Strozier asserted that he was not trying to hurt anyone, but rather, he was trying to make the men "respect him" and he returned to the altercation "to prove a point."

[¶9.] Strozier was indicted for murder in the second degree for the death of Iron Hawk and aggravated assault for the injury to Thornton. He moved to suppress his statements made during the interrogation. He argued that he had not validly waived his *Miranda* rights. He also argued that his statements were not voluntary. Both arguments were premised on his contention that his head injuries, intoxication, pain medication, sleep deprivation, and law enforcement coercion prevented a valid *Miranda* waiver and a voluntary statement.

---

4. At one point in the interrogation, however, Strozier acknowledged that he may have been beaten after he swiped at the men with the knife.

5. At one point, Strozier indicated that he obtained the knife when he returned to his room after the initial altercation. He later claimed that he did not return to his room for the knife because the knife was already in his pocket.

[¶10.]     After a hearing and a review of the video recording of the interrogation, the circuit court ruled that under the totality of the circumstances, Strozier waived his *Miranda* rights and his statements were voluntary. The court found that Strozier was at least of average intelligence, he had extensive prior experience with law enforcement over a thirty-five year period, and the interrogation was not extremely lengthy or repetitive. The court acknowledged that Strozier had been awake for approximately twenty-three hours at the time of the interrogation. But the court found that he "did not appear sleepy, he did not yawn[ ] frequently, . . . he did not lay his head down to nap [while] he waited for Detective Carda[, and] [h]e did not tell Detective Carda that he was too tired to continue." The court found that "[t]here was no evidence that this lack of sleep affected the voluntariness of [the] waiver." With respect to intoxication, the court noted that the video recording did not reveal "any slurred speech, any difficulty walking, [Strozier] did not appear incoherent at any time . . . and he was anxious and eager to get his points and opinions across[.]" With respect to medication, the court found that Strozier was given a small dose of pain medication, the only effect of which would have made him slightly drowsy. With respect to law enforcement coercion and tactics, the court acknowledged that Carda did not inform Strozier of Iron Hawk's death until halfway through the interrogation. But the court concluded that Carda was not required to inform Strozier of Iron Hawk's death in order to obtain a voluntary statement. Therefore, the court denied the motion to suppress.

[¶11.]     At trial, the State's witnesses[6] testified that during the first altercation, Strozier was pushed to the ground and went back to his motel room. The witnesses testified that he then returned to the scene with a knife, started arguing with the group again, and swiped at Iron Hawk and Thornton, causing their injuries. The witnesses indicated that it was only after these injuries were inflicted that Strozier was beaten by members of the group.

[¶12.]     Strozier testified to a different chain of events and claimed that he had swiped at Iron Hawk and Thornton in self-defense. He testified that after work, he went to his motel room, showered, put his work knife in his pants, and left to meet his friends. He stated that when he and his friends returned to his motel, Thornton and Iron Hawk pushed him down, punched him, and kicked him. Strozier claimed that he feared for his life, and therefore, he ran to his motel room. He stated that he then left his room to use a pay phone across the street to call 911, but stopped at the group's location on his way. He claimed that Iron Hawk seemed "really frisky" and "really aggressive." He testified that one of the men tried to grab him, so he grabbed his knife and swiped at Iron Hawk and Thornton. He stated that he swiped at the men because he thought they were going to beat him again.

[¶13.]     The jury convicted Strozier of murder in the second degree and aggravated assault. He appeals, raising the following issues:

> 1.     Whether his statements were obtained pursuant to a valid *Miranda* waiver and whether the statements were voluntary.

---

6.     The eye witnesses included a cab driver who had observed the altercation, Strozier's girlfriend, Thornton, and three other members of the group that Iron Hawk and Thornton were standing with outside the motel.

> 2. Whether there was sufficient evidence to support the jury's rejection of his claim of self-defense.

*Decision*

*Strozier's Statements*

[¶14.] Strozier argues that his statements were not obtained pursuant to a valid *Miranda* waiver and his statements were not voluntary. We give deference to the circuit court's factual findings, but we review de novo the question whether a defendant validly waived his or her *Miranda* rights. *State v. Tuttle*, 2002 S.D. 94, ¶ 6, 650 N.W.2d 20, 25. The voluntariness of incriminating statements is also a legal question that we review de novo. *See id.* ¶ 20.

[¶15.] To establish a valid *Miranda* waiver, the State must show by a preponderance of the evidence that "the defendant voluntarily, knowingly, and intelligently waived *Miranda* rights." *Id.* ¶¶ 7-8. This requires a showing that: "(1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them." *Id.* ¶ 9. The totality of the circumstances of the interrogation is considered. *State v. Ralios*, 2010 S.D. 43, ¶ 24, 783 N.W.2d 647, 655. This involves a consideration of the "defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition." *Id.* ¶ 25.

[¶16.] In this case, the totality of the circumstances establishes that Strozier voluntarily, knowingly, and intelligently waived his *Miranda* rights. The record reflects that he was of at least average intelligence, he maintained full-time

employment, and he had extensive prior experience with the criminal justice system.[7]

[¶17.] Nevertheless, Strozier argues that "even if [his] age, experience, intelligence, and background . . . ma[d]e him capable of . . . waiving his rights under normal conditions, his physical and mental condition rendered him unable to do so[.]" He specifically contends that he was incapable of waiving his rights because of pain from his injuries, intoxication, and sleep deprivation.

[¶18.] Although Strozier points out that he complained about pain from his head injury, he never exhibited any sign that the pain impaired his ability to voluntarily, knowingly, and intelligently converse and respond to Carda. Further, his medical treatment shortly before the interrogation reflected that he was alert and oriented to person, place, and time. The treating physician specifically noted that Strozier was not in any acute distress. Also, he never requested additional medical treatment or asked Carda to stop the questioning. Strozier only complained of pain while waiting for the interrogation to start. Once the interrogation began, Strozier only referred to his injuries to justify his claim of self-defense.[8]

---

7. Strozier had six criminal convictions and two criminal dismissals in South Dakota since 2003. One of the South Dakota convictions was a felony. The record also reflects that he was convicted of at least three felonies in other states.

8. After receiving medical treatment, Strozier was given one dose of pain medication. At the hearing on the motion to suppress, the treating physician testified that the only side effect of the pain medication was slight drowsiness. There is no evidence that the pain medication impaired

(continued . . .)

[¶19.] There is also no evidence that Strozier's level of intoxication impaired his ability to waive his rights. "The test of voluntariness of one who claims intoxication at the time of waiving his rights . . . is whether the individual was of sufficient mental capacity to know what he was saying—capable of realizing the meaning of his statement—and that he was not suffering from any hallucinations or delusions." *Coon v. Weber*, 2002 S.D. 48, ¶ 18, 644 N.W.2d 638, 645. Here, Strozier does not contend that he did not know what he was saying or that he was having hallucinations or delusions. On the contrary, a review of the video recording indicates that he understood what he was saying, and he was not suffering from hallucinations or delusions. This record reflects that even though Strozier had consumed alcoholic beverages, he was not so intoxicated as to be incapable of waiving his rights. *See State v. Tapio*, 459 N.W.2d 406, 411-12 (S.D. 1990) (concluding that even though the defendant's blood alcohol content was 0.164, his statements were voluntary because the officer did not sense that the defendant was intoxicated and the defendant appeared to understand the questions).

[¶20.] Although Strozier also claims that he was deprived of sleep, he never indicated during the interrogation that he was tired. On the contrary, the video recording shows that he was alert and animated. We find that "there is no evidence that [Strozier] was so overcome by fatigue or stress as to prevent" a valid waiver of his rights. *See State v. Aesoph*, 2002 S.D. 71, ¶ 28, 647 N.W.2d 743, 754. Further, our review of the interrogation's video recording reflects that Strozier understood

_____

(. . . continued)
Strozier's ability to voluntarily, knowingly, and intelligently respond to Detective Carda.

Detective Carda's advisement of rights and the consequences of waiving them. We conclude that under the totality of the circumstances, Strozier voluntarily, knowingly, and intelligently waived his *Miranda* rights.[9]

[¶21.]     Strozier also argues that his statements were involuntary. "[T]he validity of a *Miranda* waiver of rights and the voluntariness of an admission are separate but parallel inquiries." *Tuttle*, 2002 S.D. 94, ¶ 20, 650 N.W.2d at 30. "Once suspects in custody are properly advised of, and agree to waive, their *Miranda* rights, they may be freely questioned as long as interrogators do not obtain a confession through coercion." *Id.* ¶ 22. "The voluntariness of a confession depends on the absence of police overreaching. Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will." *Id.* ¶ 20 (internal citation omitted). Two factual inquiries are relevant.

> The factual inquiry centers on (1) the conduct of law
> enforcement officials in creating pressure and (2) the suspect's
> capacity to resist that pressure. On the latter factor, we
> examine such concerns as the defendant's age; level of education
> and intelligence; the presence or absence of any advice to the
> defendant on constitutional rights; the length of detention; the

9.     Strozier contends that several of the State's cases are inapposite because they discuss the circumstances of the interrogation in the context of the voluntariness of statements, rather than in the context of a valid *Miranda* waiver. However, analyzing the voluntariness of statements encompasses the totality of the circumstances, which is also relevant in the context of a *Miranda* waiver. *See State v. Tuttle*, 2002 S.D. 94, ¶¶ 18, 20, 650 N.W.2d 20, 29-30. The two legal issues are not mutually exclusive. *See id.* ¶ 20 n.4, 650 N.W.2d at 30 n.4 (quoting the Supreme Court's holding in *Colorado v. Connelly*, 479 U.S. 157, 169-70, 107 S. Ct. 515, 523, 93 L. Ed. 2d 473 (1986), that "there is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.")

> repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect.

*Id.* ¶ 22 (internal citations and quotation marks omitted).

[¶22.]     With respect to the first factual inquiry, Strozier contends that law enforcement pressured him to make incriminating statements by: detaining him for six hours, depriving him of medical treatment and access to a restroom without a police escort, making him wait over an hour before the interrogation began, informing him that he was not the villain in the altercation, informing him of other witnesses' accounts of the incident, and not informing him of Iron Hawk's death. With respect to the second inquiry, Strozier contends that he lacked the capacity to resist pressure by law enforcement because of his head injury, sleep deprivation, intoxication, and the lack of cigarettes.

[¶23.]     The evidence does not, however, indicate that Strozier's will was overborne because of pressure by law enforcement or any lack of capacity to resist pressure. First, as we previously indicated, Strozier's education, intelligence, physical condition, and mental condition did not suggest an inability to resist pressure. Also, he was not refused medical treatment or access to a restroom. Further, although he was detained for six hours, that time period included his arrest, treatment at the hospital, and the interrogation. And even though he had to wait over an hour before the interrogation began (because Detective Carda was interviewing other witnesses in the case), the actual questioning only lasted two

hours.  *Cf. State v. Fisher*, 2011 S.D. 74, ¶ 22, 805 N.W.2d 571, 576-77 (ruling that, among other things, a six-hour interview did not impair a defendant's ability to make voluntary statements).  Additionally, Detective Carda's statement that Strozier was not a villain, Carda's repetition of other witnesses' accounts, and Carda's failure to inform Strozier of Iron Hawk's death were not coercive psychological tactics.  We conclude that, considering the totality of the circumstances, Strozier's statements were voluntary.

*Sufficiency of the Evidence*

[¶24.]     Strozier argues there was insufficient evidence to support the convictions because the evidence reflected that he acted in self-defense.  "Our review of the sufficiency of the evidence is de novo."  *State v. Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d 763, 764.  We do not "resolve conflicting evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence."  *State v. Jucht*, 2012 S.D. 66, ¶ 18, 821 N.W.2d 629, 633.  The question is not whether we believe "the evidence at the trial established guilt beyond a reasonable doubt."  *Plenty Horse*, 2007 S.D. 114, ¶ 5, 741 N.W.2d at 765.  "It is the jury's responsibility, not ours, 'to decide what conclusions should be drawn from evidence admitted at trial.'"  *State v. Toohey*, 2012 S.D. 51, ¶ 27, 816 N.W.2d 120, 131 (quoting *Coleman v. Johnson*, ___ U.S. ___, ___, 132 S. Ct. 2060, 2062, 182 L. Ed. 2d 978 (2012)).  Thus, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*

[¶25.]     Strozier argues that "the evidence in the light most favorable to the verdict shows that [he] acted in self-defense."  He highlights his statements to the

police in which he indicated that he had been attacked and was protecting himself when he swiped at Iron Hawk and Thornton. He also points to his trial testimony where he claimed that Iron Hawk and Thornton attacked him. He contends that he feared for his safety and "used a reasonable amount of force to protect himself."

[¶26.] SDCL 22-5-9(1) permits self-defense:

> Any person, upon reasonable apprehension of threat of bodily injury, may make sufficient resistance to prevent an offense against his or her person or the person of any family or household member, or to prevent an illegal attempt by force to take or injure property in his or her lawful possession[.]

In this case, the jury was properly instructed on this defense. The instructions informed the jury to determine whether Strozier had a reasonable apprehension of threat of injury, and if so, whether he used reasonable force in defending himself.

[¶27.] The jury heard evidence that Strozier was merely pushed to the ground during the initial altercation. The jury also heard evidence that he then went back to his motel room and obtained the knife before returning to the scene and stabbing Thornton and Iron Hawk. Further, several eye witnesses testified that he was not beaten until after the stabbings. Finally, the jury heard his admission that he returned to the scene "to make the men respect him" and "to prove a point." The jury had sufficient evidence to reject Strozier's claim of self-defense.

[¶28.] Affirmed.

[¶29.] GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON and WILBUR, Justices, concur.