#29712-a-SPM
**2022 S.D. 58**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

v.

TRISTIN LARSON,                            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BOBBI J. RANK
Judge

\* \* \* \*

BRAD A. SCHREIBER
Pierre, South Dakota                       Attorney for defendant
                                           and appellant.


MARK VARGO
Attorney General

PAUL S. SWEDLUND
Solicitor General
Pierre, South Dakota                       Attorneys for plaintiff
                                           and appellee.

\* \* \* \*

                                           ARGUED
                                           APRIL 26, 2022
                                           OPINION FILED **10/05/22**

#29712

MYREN, Justice

[¶1.]	Tristin Larson was indicted for aggravated battery of an infant and alternative counts of second-degree murder or first-degree manslaughter for the death of Easton Felix (Easton). The circuit court denied Larson's motion to suppress statements he made to law enforcement and his motion for judgment of acquittal. The jury convicted him of second-degree murder and aggravated battery of an infant. Larson appeals. We affirm.

**Facts and Procedural History**

[¶2.]	Larson and Elizabeth Felix (Felix) were in a romantic relationship for nearly a year. Felix had a two-year-old son, Easton. Larson, Felix, and Easton lived in a house with Larson's mother, Melissa Marmo, in Pierre, South Dakota. On April 16, 2020, Larson watched Easton while Felix was at work. Larson got mad at Easton because he was not listening to him. Larson pushed Easton on the forehead, which caused him to fall to the floor and hit his head.[1] Easton began crying and stood up but fell a second time. After his second fall, Easton began to convulse.

[¶3.]	Larson called Felix, told her he pushed Easton and explained that Easton was not getting up. Felix told Larson to call the police, but he told her he did not want to do that. Felix and Larson remained on the phone during the 20 minutes it took Felix to walk home. Larson told her he pushed Easton because

---

1.	As the only witness of the incident, Larson's depiction of what happened necessarily provides the initial impression of what occurred. The State's theory of the case was that Larson's conduct was significantly more aggressive than a simple push. The State attempted to prove its theory of the case through Larson's own description as well as expert testimony that the injuries were inconsistent with a mere push.

-1-

Easton was not listening and that she should not call the police because he did not want to get into trouble. Larson also told her to blame their dog if anyone asked what happened. When she arrived at the house, Easton was lying on the couch, and Larson was pacing back and forth. Larson resisted Felix's requests to call 911 but agreed to call his mother. Marmo arrived promptly and took Easton to the hospital.

[¶4.] Law enforcement talked with Larson, Felix, and Marmo at the hospital. Larson and Felix said Easton was knocked off the bed by the dog. Because of bleeding in his brain, Easton was flown to Sioux Falls, South Dakota, for further care.

[¶5.] On April 17, 2020, Felix talked with Kirsten Persson, a physician's assistant from Child's Voice in Sioux Falls, and told her that she had previously lied and that Larson pushed Easton. Felix spoke with law enforcement on the same day, and she placed a recorded call to Larson. During this call, Larson denied pushing Easton. During a second recorded call the next day, Larson admitted pushing Easton.

[¶6.] Easton passed away on April 18, 2020. That same day, Larson went to the Pierre Police Department for an interview with law enforcement. At the beginning of the interview, Detective Dusty Pelle read Larson his rights:

> Pelle: You have the continuing right to remain silent and stop questioning at any time. Anything you say can be used as evidence against you. You have the continuing right to consult with and have the presence of an attorney. If you cannot afford an attorney, an attorney would be appointed for you. Do you understand these rights?
> Larson: Yes.
> Pelle: K. Do you wish to waive these rights and talk to me at this time?

Larson:     Um, yeah.

[¶7.]     During his interview with Detective Pelle, Larson admitted that he lied about the dog knocking Easton off the bed and that he pushed Easton on the head, causing him to fall to the floor.  Larson explained that he told Easton to get into the shower, but Easton did not follow his directions.  Larson described his response as follows:

> He just wouldn't turn around, so I finally got mad and I said well get, get the fuck away from me and I pushed him.  And I like, I like shoved his head and he flew back and [hit] his head on the ground pretty hard and then he started to like get up, he started crying and started to get up and then his legs like went out from under him and he fell back and hit his head again[.]

Later in the interview, Larson explained:

> I was just getting overwhelmed I fuck—I don't know why I pushed him, I didn't mean to kill him, I didn't know I was gonna kill him, just pushing him you know what I—I mean yeah, I shoved him kind of hard, but people fall all the time.

Ultimately, Larson acknowledged: "Like I knew I did it on, I, I, after I did it, I knew I did it too hard on accident."  Once the interview concluded, Detective Pelle arrested Larson for first-degree manslaughter.

[¶8.]     A Hughes County grand jury indicted Larson for a count of second-degree murder, alternative counts of first-degree manslaughter under SDCL 22-16-15(1) and (2),[2] and a count of aggravated battery of an infant under SDCL 22-18-1.4.[3]

---

2.     SDCL 22-16-15(1)-(2):

Homicide is manslaughter in the first degree if perpetrated:

(continued . . .)

#29712

[¶9.]     Larson filed a motion to suppress the statements he made during his interview with Pierre law enforcement on April 18, 2020. Larson argued that he was so emotionally distraught that the waiver of his *Miranda* rights was not legally valid. The State asserted that Larson was not in custody at the time of the interrogation but argued that even if there was a custodial interrogation, Larson voluntarily waived his rights because he understood his rights and agreed to answer questions.

[¶10.]    Detective Pelle was the only witness that testified at the evidentiary hearing on Larson's motion to suppress. He testified that the interview lasted approximately 40 to 45 minutes, with a break where he talked to Larson's mother. He noted that he read Larson his *Miranda* rights, and Larson agreed to waive them. Detective Pelle testified that Larson was not placed in restraints during the interview and had no difficulty understanding his questions. Detective Pelle stated that he did not tell Larson he was free to leave and admitted that he probably

---

(. . . continued)

> (1) Without any design to effect death, including an unborn child, while engaged in the commission of any felony other than as provided in § 22-16-4(2);
> (2) Without any design to effect death, including an unborn child, and in a heat of passion, but in a cruel and unusual manner[.]

3.     SDCL 22-18-1.4:

> Any person who intentionally or recklessly causes serious bodily injury to an infant, less than three years old, by causing any intracranial or intraocular bleeding, or swelling of or damage to the brain, whether caused by blows, shaking, or causing the infant's head to impact with an object or surface is guilty of aggravated battery of an infant.

-4-

would not have been allowed to leave. Detective Pelle arrested Larson at the end of the interview.

[¶11.] Ultimately, the circuit court concluded that Larson was subjected to a custodial interrogation[4] but had been advised of all the required *Miranda* warnings. The circuit court determined that Larson had voluntarily, knowingly, and intelligently waived his *Miranda* rights. The circuit court determined that Larson's emotional state during the interview "did not affect his ability to understand his rights, the waiver of his rights, or [Detective Pelle's] questions." The circuit court concluded that Larson "had no problem responding to [Detective Pelle] regarding the understanding and waiver of his rights and clearly expressed his desire to waive his rights and speak to [Detective Pelle]."

[¶12.] Next, the circuit court addressed the issue of whether Larson's statements were voluntary. The circuit court stated that there was "no undue pressure or conduct" exerted by Detective Pelle during the interview and that the interview was conducted "in a calm and respectful manner." The circuit court determined that "Larson was emotional at times during the interview and seemed to sleep when [Detective Pelle] stepped out to talk to his mother, [but] there is no indication that these matters eradicated his capacity to resist pressure." The circuit court specified that Larson was "focused and able to quickly and completely respond to [Detective Pelle's] questions throughout the interview." The circuit court denied the motion to suppress.

---

4. The circuit court's conclusion that Larson was subject to a "custodial interrogation" was not disputed by the State on appeal.

[¶13.] On the first day of the jury trial, Felix testified that Larson told her to blame their dog for what happened to Easton because he did not want to go to jail. She acknowledged that she did not call 911 immediately when she heard about Easton's injuries because she was worried about what Larson would do to her or Easton. She also admitted lying to law enforcement at the hospital and going along with the dog story. However, she testified that she later told Kirsten Persson that Larson pushed Easton.

[¶14.] Dr. Gokhan Olgun, a pediatric intensivist from Sanford Children's Hospital in Sioux Falls, testified about Easton's various injuries. Easton scored the lowest possible score on the Glasgow Coma Scale, a tool used to understand the alertness or responsiveness of a patient. Easton had increased intracranial pressure caused by diffused tissue swelling, brain swelling, and edema. Dr. Olgun stated that Easton suffered a significant neurological injury and did not respond to physical stimuli, and an electroencephalogram showed no electrical activity in his brain. He also noted that Easton was not breathing independently and was on a ventilator. Dr. Olgun testified that Easton's heart stopped beating at 2:25 p.m. on April 18, 2020.

[¶15.] Dr. Jaime Liudahl, an emergency room physician, testified about Easton's condition when he first arrived at the Avera St. Mary's Hospital in Pierre. He stated that Easton showed decreased responsiveness, and his pupils were unequal, indicating a brain injury. Dr. Liudahl said Easton was experiencing decorticate posturing (involuntary flexing of muscles that looks like seizure activity) caused by a brain injury or brain irritation. Dr. Liudahl testified that Easton

suffered from bradycardia caused by increased intracranial pressure from bleeding in his brain. Bradycardia is when the heart slows below the normal range. A computed tomography (CT) scan of Easton's head revealed that he had an intraventricular subdural hemorrhage, a bilateral frontal subdural hemorrhage, and a likely subarachnoid hemorrhage. Dr. Liudahl explained that acceleration-deceleration forces cause these types of hemorrhages where the head hits something with abrupt force.

[¶16.]    Dr. Barry Monfore, a diagnostic radiologist from Avera St. Mary's Hospital, interpreted Easton's CT scan. Dr. Monfore testified that Easton's CT scan showed he had a bifrontal subdural hemorrhage, interhemispheric hemorrhage, and subarachnoid hemorrhage. His opinion was that these injuries were consistent with non-accidental trauma caused by acceleration-deceleration forces such as violent shaking or blunt force trauma to the head.

[¶17.]    Detective Pelle testified about his interview with Larson. The interview video was admitted into evidence and published to the jury during his testimony. On cross-examination, Detective Pelle testified that Larson was emotional during the interview and that Larson told him that he did not mean to cause Easton's death. Detective Pelle stated that he believed what Larson told him was the truth. On redirect, Detective Pelle clarified that Larson said the push to Easton was intentional.

[¶18.]    Dr. Geoffrey Tufty, a pediatric ophthalmologist in Sioux Falls, conducted an eye examination on Easton. He testified that Easton's eyes had intraretinal hemorrhages in all four quadrants of the retina extending to the ora

serrata (the edge of the retina). He stated injuries related to household falls or accidental falls are usually located around the optic nerve or into the orbit of the eye, not in the ora serrata. Dr. Tufty opined that the force that would cause Easton's injuries was a rapid acceleration-deceleration mechanism, and the events that would cause such a force would be a blow to the head or a head blow to a hard surface. He further asserted that Easton's injuries were a marker for abusive head trauma.

[¶19.] In addition to speaking with Felix about the circumstances leading up to Easton's injuries, Kirsten Persson also examined Easton due to concerns of physical abuse. She testified that Easton was in a coma and on mechanical ventilation during her evaluation. She testified that Easton had pinpoint bruising on both of his ears, bruising on his right arm, bruising and a lesion on his right leg, a bruise on his left calf muscle, a bruise on his left jaw near his chin, and a linear bruise on his left buttock. She also reviewed the results of his CT scan. Her opinion was that Easton's injuries were from physical abuse that could be specified as abusive head trauma. Further, she asserted that an intentional push done in anger is not accidental.

[¶20.] Dr. Kenneth Snell, the coroner for Minnehaha and Lincoln Counties and a forensic pathologist, performed Easton's autopsy on April 20, 2020. He testified that his examination revealed subdural and subarachnoid hemorrhaging. His opinion was that the strike upon Easton's head, and the subsequent fall onto the floor, represented a rapid acceleration-deceleration injury. This caused shearing forces between Easton's brain vessels and skull, resulting in

hemorrhaging. Dr. Snell also testified about Easton's multiple retinal hemorrhages and stated these injuries were associated with a rapid acceleration-deceleration type of injury. It was his opinion that Easton's cause of death was traumatic brain injury due to assault, and the manner of death was homicide.

[¶21.] After the State rested, Larson made a motion for judgment of acquittal. He requested acquittal on the second-degree murder charge, arguing that the State failed to present sufficient evidence of an act imminently dangerous to others or of a depraved mind. He acknowledged that there was evidence that Larson pushed Easton but argued there was no evidence that the push was intended to harm Easton. Larson requested acquittal on the first-degree manslaughter charge and contended that the State did not provide sufficient evidence that Larson committed a felony, a reckless act, or an act in the heat of passion. He argued that the evidence showed an accident with unintended consequences. Lastly, Larson argued that there was insufficient evidence for aggravated battery because there was no evidence that he committed a reckless act. The circuit court denied the motion for acquittal.

[¶22.] On the third day of trial, the defense first called Sarah Big Eagle. She testified that she knew both Larson and Felix her whole life and never saw Larson discipline or be inappropriate with Easton. Dr. Brad Randall, a forensic pathologist, testified that he disagreed with Dr. Snell's determination that the cause of death was homicide. In his view, where the actor's intent was unclear, the cause of death on the death certificate should be listed as undetermined, meaning it could be an accident or a homicide.

[¶23.] After both parties rested, Larson renewed his motion for judgment of acquittal, and the circuit court denied the motion. The jury found Larson guilty of second-degree murder and aggravated battery of an infant. Larson admitted the allegations in the part II information. The circuit court sentenced Larson to life imprisonment for second-degree murder and 55 years for aggravated battery of an infant. The sentences were concurrent. Larson appeals.

**Analysis and Decision**

**1.     *Whether the circuit court erred in denying Larson's motion to suppress his statements made to law enforcement at the April 18 interview.***

[¶24.] Larson argues that the circuit court erred when it denied his motion to suppress his statements made to law enforcement at the April 18 interview. He states that he was mentally and emotionally distraught, causing him to be unable to understand his *Miranda* rights or to voluntarily, intelligently, or knowingly waive them. Larson contends that his "Um, yeah" answer is not a clear and unequivocal waiver of his rights. Further, he argues that his confession was not voluntary due to his emotional state during the interview. He asserts that the findings of fact entered by the circuit court are inconsistent with the circuit court's conclusions. Instead, he believes that the circuit court's findings force the conclusion that Larson did not voluntarily waive his *Miranda* rights and that his statements to the police were not voluntary.

[¶25.] "We review 'the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review.'" *State v. Willingham*, 2019 S.D. 55, ¶ 21, 933 N.W.2d 619,

625 (quoting *State v. Rolfe*, 2018 S.D. 86, ¶ 10, 921 N.W.2d 706, 709). "[W]e review *de novo* a [circuit] court's ruling on the question whether a defendant knowingly, intelligently, and voluntarily waived *Miranda* rights." *Id.* ¶ 22, 933 N.W.2d at 625 (alterations in original) (quoting *State v. Tuttle*, 2002 S.D. 94, ¶ 6, 650 N.W.2d 20, 25). "The burden is on the State to prove the defendant's admissions were voluntary by a preponderance of the evidence." *Id.*

### Miranda Waiver

[¶26.] "A waiver [of Miranda rights] need not be explicit, but '[t]o prove a valid waiver, the State must show that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them.'" *State v. Two Hearts*, 2019 S.D. 17, ¶ 21, 925 N.W.2d 503, 512 (second alteration in original) (quoting *Tuttle*, 2002 S.D. 94, ¶ 9, 650 N.W.2d at 26). "The State must prove the validity of the waiver by a preponderance of the evidence." *Id.*

[¶27.] "A court examines the totality of the circumstances when considering whether a valid waiver has taken place, such as 'a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition.'" *Id.* ¶ 22, 925 N.W.2d at 512 (quoting *State v. Lewandowski*, 2019 S.D. 2, ¶ 21, 921 N.W.2d 915, 921). "A waiver may be inferred from the defendant's understanding of the rights coupled with 'a course of conduct reflecting a desire to give up those rights.'" *Id.* (quoting *State v. Diaz*, 2014 S.D. 27, ¶ 47, 847 N.W.2d 144, 160).

[¶28.]        Larson argues that his emotional state during the interview prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights. This Court has addressed whether a defendant knowingly, intelligently, and voluntarily waived their *Miranda* rights in the context of psychological pressure, intoxication, impaired mental state, sleep deprivation, lack of understanding of English, and being a juvenile. *See, e.g.*, *Lewandowski*, 2019 S.D. 2, ¶¶ 25–26, 921 N.W.2d at 921–22 (defendant argued he was mentally impaired because he was intoxicated and had mental health issues); *Two Hearts*, 2019 S.D. 17, ¶ 25, 925 N.W.2d at 513 (defendant argued he experienced drug withdrawals and psychological pressures); *Diaz*, 2014 S.D. 27, ¶ 23, 847 N.W.2d at 154 (defendant was a juvenile); *State v. Ralios*, 2010 S.D. 43, ¶ 23, 783 N.W.2d 647, 654 (defendant argued he was not proficient in English and was sleep deprived). Moreover, this Court has recognized that the defendant's mental state is one of the circumstances considered when determining whether a defendant has waived their *Miranda* rights. *Two Hearts*, 2019 S.D. 17, ¶ 22, 925 N.W.2d at 512.

[¶29.]        At the beginning of the interview, Larson's head was down on the table in his arms when Detective Pelle read him his rights and asked him whether he understood his rights. Larson responded by saying, "Yes." When Detective Pelle asked Larson if he wished to waive his rights and speak to him, Larson lifted his head, looked at Detective Pelle, and stated, "Um, yeah." After this answer, Larson told the detective in detail what happened on April 16, 2020. Larson's reactions and responses during the interview do not support his argument that his emotional condition prevented him from understanding his rights and waiving them. His

conduct shows that he was not confused or unable to decide to waive his *Miranda* rights. Instead, his response of "Um, yeah," and raising his head off the table to look at Detective Pelle show that he understood the questions and knew he was waiving his *Miranda* rights. *See Massachusetts v. McNulty*, 937 N.E.2d 16, 35 (Mass. 2010) (stating that being "emotional[ly] upset alone does not render a waiver of [*Miranda*] rights or the voluntariness of the statement itself invalid where there is no evidence that the defendant was acting irrationally [during the interrogation]." (third alteration in original) (quoting *Commonwealth v. Auclair*, 828 N.E.2d 471, 478 (Mass. 2005))).

[¶30.] In *Ralios*, the defendant argued that his "yeah" response was "meaningless conversation filler." 2010 S.D. 43, ¶ 31, 783 N.W.2d at 656. This Court disagreed and determined that the defendant's "yeah" response "was an affirmative and unequivocal positive response" to waive his *Miranda* rights. *Id.* ¶ 34, 783 N.W.2d at 657. Like the defendant in *Ralios*, Larson said, "Um, yeah" when asked whether he wanted to waive his rights and talk to the detective. He then answered all of the detective's questions until the detective concluded the interview. "A *Miranda* waiver may be inferred from the defendant's understanding of the rights coupled with a course of conduct reflecting a desire to give up those rights." *Lewandowski*, 2019 S.D. 2, ¶ 21, 921 N.W.2d at 921 (quoting *Tuttle*, 2002 S.D. 94, ¶ 16, 650 N.W.2d at 29). Larson was fully engaged during the interview and provided detailed answers to Detective Pelle's questions regarding Easton's incident. This type of conduct is indicative of a "course of conduct reflecting" Larson's desire to waive his *Miranda* rights. *See Diaz*, 2014 S.D. 27, ¶ 49, 847

N.W.2d at 161 (concluding that answering questions reflected the defendant's desire to waive *Miranda* rights); *Ralios*, 2010 S.D. 43, ¶ 34, 783 N.W.2d at 658 ("Defendant's willingness to answer questions about the potential charges against him showed a course of conduct reflecting a desire to give up his *Miranda* rights . . . ."); *State v. Rhines*, 1996 S.D. 55, ¶ 36, 548 N.W.2d 415, 429 (noting that the defendant's "articulate and detailed" answers to questions was conduct showing a valid waiver).

[¶31.]     The totality of the circumstances surrounding Larson's interview supports the circuit court's conclusion that Larson's waiver was intelligent, knowing, and voluntary.

***Voluntariness of Confession***

[¶32.]     "[T]he validity of a *Miranda* waiver of rights and the voluntariness of an admission are separate but parallel inquiries." *State v. Strozier*, 2013 S.D. 53, ¶ 21, 834 N.W.2d 857, 864 (citation omitted). Whether a confession was voluntary is a legal question and reviewed de novo. *Tuttle*, 2002 S.D. 94, ¶ 20, 650 N.W.2d at 30.

[¶33.]     "Once suspects in custody are properly advised of, and agree to waive, their *Miranda* rights, they may be freely questioned as long as interrogators do not obtain a confession through coercion." *Strozier*, 2013 S.D. 53, ¶ 21, 834 N.W.2d at 864 (citation omitted). "The voluntariness of a confession depends on the absence of police overreaching. Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will." *Id.* (citation omitted).

> Two factual inquiries are relevant.
>
> The factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. On the latter factor, we examine such concerns as the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect.

*Id.* (citation omitted).

[¶34.] Larson argues that his admissions to law enforcement were not voluntary because he was emotionally impaired during questioning. Larson does not challenge the circuit court's findings but contends that the findings support his position that his emotional state impaired his ability to give a voluntary confession.

[¶35.] The circuit court found that Larson was 21 years old at the time of the interview and had previous "significant exposure" to the criminal justice system. Detective Pelle told Larson the purpose of the interview, and Larson agreed to participate. The circuit court found that Larson was placed in an interview room but was not handcuffed. Detective Pelle wore his service weapon and never informed Larson that he was free to leave. Detective Pelle read Larson all of his *Miranda* rights from a pre-printed card. As the circuit court noted, Larson was "very emotional and remorseful" at several points during the interview. Still, Detective Pelle would wait for Larson to compose himself before continuing his questioning. The circuit court found that Detective Pelle asked questions in a calm

and sometimes sympathetic manner. In response to these questions, "Larson was fully engaged with [Detective Pelle] and clearly understood [Detective Pelle's] questions." The circuit court found that "Larson was able to give detailed responses and demonstrations" about what happened to Easton. The total time of the interview was one hour but included in that hour was a 30-minute break without questioning.

[¶36.] Based on these findings, the circuit court concluded: "there was no undue pressure or conduct by [Detective Pelle]." Also, the circuit court concluded that Larson's emotional state at times during the interview did not "eradicate[] his capacity to resist pressure."

[¶37.] Our de novo review also reveals that Larson was able to respond and give detailed answers to Detective Pelle's questions despite being emotional. There is no indication that Larson's periodically heightened emotional state impacted his "ability to make an unconstrained, autonomous decision to confess." *See State v. Morato*, 2000 S.D. 149, ¶ 12, 619 N.W.2d 655, 660 ("A defendant's will is overborne, making a statement involuntary, when interrogation tactics and statements are so manipulative or coercive as to deprive a defendant of the 'ability to make an unconstrained, autonomous decision to confess.'" (citation omitted)); *see also State v. Jenner*, 451 N.W.2d 710, 717 (S.D. 1990) ("Mere emotionalism does not necessarily invalidate a confession."). When Larson became emotional, Detective Pelle waited until Larson collected himself before continuing the interview. There is no evidence from the record or video that Larson misunderstood the questions he answered.

[¶38.] Considering the totality of the circumstances, we determine that the circuit court did not err in concluding that Larson's interview statements were voluntary. We affirm the circuit court's denial of Larson's motion to suppress.

> **2.** **Whether the circuit court erred in denying Larson's motion for judgment of acquittal and whether the evidence was sufficient to sustain the convictions.**

[¶39.] This Court reviews the denial of a motion for acquittal de novo. *State v. Armstrong*, 2020 S.D. 6, ¶ 12, 939 N.W.2d 9, 12. "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d 62, 68 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). "[T]he jury is the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Id.* (alteration in original) (citation omitted). "In determining the sufficiency of the evidence, this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence." *Id.* (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 33, 889 N.W.2d 404, 413).

*Second-Degree Murder*

[¶40.] Larson argues that the State failed to present evidence that his actions were "imminently dangerous to others and evincing a depraved mind." He asserts that although he intended to push Easton, he did not intend the push to cause injury or death. Larson claims on appeal, as he did to the jury, that Easton's death resulted from an accidental consequence of the push. Larson contends the evidence

was insufficient to establish he acted with a depraved mind because the one push resulted in unforeseen and unintended injuries.

[¶41.]        SDCL 22-16-7 defines second-degree murder as "perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child."

[¶42.]        Second-degree murder is a general-intent crime requiring the State to prove the defendant "had the intent to do the physical act or recklessly committed 'the physical act which the crime requires[.]'" *Kleinsasser v. Weber*, 2016 S.D. 16, ¶ 24, 924 N.W.2d 455, 464, *as modified* (Apr. 18, 2016) (citation omitted). "[T]he State must prove that the defendant's conduct established that he was acting with a depraved mind." *State v. Little Long*, 2021 S.D. 38, ¶ 69, 962 N.W.2d 237, 259. "Depraved mind" is a "mens rea requirement involv[ing] less culpability than the element of premeditation required for first-degree murder." *Id.* (citation omitted). "If a person is able to act with a lack of regard for the life of another, then that person can be convicted of second degree murder." *Frias*, 2021 S.D. 26, ¶ 23, 959 N.W.2d at 68 (quoting *State v. Laible*, 1999 S.D. 58, ¶ 13, 594 N.W.2d 328, 332). "[W]hether conduct is imminently dangerous to others and evincing a depraved mind regardless of human life is to be determined from the conduct itself and the circumstances of its commission." *Id.* ¶ 23, 959 N.W.2d at 69 (citation omitted).

[¶43.]        Perhaps the most compelling evidence presented to the jury was Larson's explanation during his videotaped interview with Detective Pelle and the medical testimony documenting the severe injuries Easton sustained as a result of

Larson's actions. During that interview, Larson described and demonstrated how he "pushed" Easton. Larson stated, that after Easton would not go into the shower,

> I finally got mad and I said well get, get the fuck away from me and I pushed him. And I like, I like shoved his head and he flew back and [hit] his head on the ground pretty hard and then he started to like get up, he started crying and started to get up and then his legs like went out from under him and he fell back and hit his head again[.]

Larson further stated,

> I was just gettin[g] overwhelmed I fuck . . . I don't know why I pushed him, I didn't mean to kill him, I didn't know I was gonna kill him, just pushing him you know what I . . . I mean yeah, I shoved him kind of hard, but people fall all the time.

He told Detective Pelle, "Like I knew I did it on, I, I, after I did it, I knew I did it too hard on accident."

[¶44.] Dr. Liudahl testified that Easton's injuries included bradycardia, decorticate posturing, an intraventricular subdural hemorrhage, bilateral frontal subdural hemorrhage, and a likely subarachnoid hemorrhage. He explained that Easton's hemorrhages were caused by his head abruptly hitting something. Dr. Monfore also testified that Easton suffered from a bifrontal subdural hemorrhage, interhemispheric hemorrhage, and subarachnoid hemorrhage. Dr. Monfore opined that Easton's injuries resulted from non-accidental trauma caused by either violent shaking or blunt force trauma to Easton's head. Dr. Tufty testified that Easton's eyes had intraretinal hemorrhages extending to the ora serrata. Dr. Tufty stated that these injuries are not typically seen with accidental falls and are associated with shaking or a blow to the head. Kirsten Persson testified about the bruises found on Easton's ears, right arm, left leg, left jaw, and buttock. She opined that

-19-

Easton's injuries were from physical abuse and abusive head trauma. Dr. Snell testified about the subdural, subarachnoid, and retinal hemorrhaging he found on Easton during his post-mortem examination. He opined that these injuries constituted a traumatic brain injury caused by the rapid acceleration-deceleration event of the strike upon Easton's head and his subsequent fall to the floor.

[¶45.] The jury rejected Larson's theory that his push to Easton's head resulted in an accidental death and found him guilty of second-degree murder. Here, the State presented sufficient evidence to show that Larson had a "depraved mind" when he pushed or shoved Easton to the ground with such force as to cause the significant head injuries that led to Easton's death. *See State v. Falkenberg*, 2021 S.D. 59, ¶ 36, 965 N.W.2d 580, 591 ("[A] blow to [the victim]'s face, with force sufficient to cause a 'fighter's fracture' on [defendant]'s right hand, evinces an indifference to human life and the depravity necessary to support a second-degree murder charge."); *State v. Harruff*, 2020 S.D. 4, ¶ 42, 939 N.W.2d 20, 31 (Defendant's "admission that he struck [the victim] in the chest with the force of a mule kick evinces a lack of regard for her life" that was sufficient, in combination with the other facts of the case, to support a second-degree murder conviction); *State v. Miller*, 2014 S.D. 49, ¶ 29, 851 N.W.2d 703, 709 (noting that testimony from physicians that the victim's "injuries were from shaking, or blows, and were non-accidental in nature" was sufficient evidence for second-degree murder).

[¶46.] "No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt." *State v. Shaw*, 2005 S.D. 105, ¶ 19, 705 N.W.2d 620,

626 (quoting *State v. Buchholz*, 1999 S.D. 110, ¶ 33, 598 N.W.2d 899, 905). When the evidence is viewed in a light most favorable to the verdict, a rational trier of fact could have found the essential elements of second-degree murder beyond a reasonable doubt.

***Aggravated Battery of an Infant***

[¶47.]    Larson also contends there was insufficient evidence to establish the elements of aggravated battery of an infant. The State asserted that Larson was "reckless" because he pushed Easton with sufficient force to cause him to fall and hit his head on the ground with such force that he suffered injuries to his brain that caused his death. Jury instruction No. 36 defined "recklessly" as "a conscious and unjustifiable disregard of a substantial risk that one's conduct may cause a certain result or may be of a certain nature." Further, the circuit court instructed the jury that "[a] person is reckless with respect to circumstances when the person consciously and unjustifiably disregards a substantial risk that such circumstances may exist."

[¶48.]    Larson insists that the incident involving Easton was an accident and that the evidence does not show a substantial risk that Easton would fall, causing him injury. Larson notes that the room where the incident occurred was carpeted with no dangerous objects on the floor or in the vicinity.

[¶49.]    During his interview with Detective Pelle, however, Larson admitted that he was mad and pushed Easton hard enough to cause him to fall and strike his head on the floor with sufficient force to make an audible noise. He said he knew right away that he had pushed him too hard.

[¶50.]    As previously noted, the State presented testimony about Easton's significant injuries, including bifrontal subdural, interhemispheric, subarachnoid, and intraretinal hemorrhaging. These injuries were fatal for Easton. Furthermore, several witnesses testified that Easton's injuries were not accidental and were associated with child abuse. Dr. Snell opined that the manner of Easton's death was homicide due to traumatic brain injury. The jury heard Larson's theory of the case that Easton's death was an accident and rejected it. In determining the sufficiency of the evidence, it is not this Court's task to resolve conflicting evidence or weigh the evidence. *Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d at 68. Here, there is sufficient evidence that a rational trier of fact could find the essential elements of aggravated battery of an infant. Specifically, that Larson's actions were at least reckless.

[¶51.]    Based on our review of the record, the evidence is sufficient to support the conviction of aggravated battery of an infant. The circuit court did not err by denying Larson's motions for judgment of acquittal.

## Conclusion

[¶52.]    The circuit court did not err in denying Larson's motion to suppress his statement to law enforcement or his motions for judgment of acquittal. There was sufficient evidence to support the convictions for second-degree murder and aggravated battery of an infant. The convictions are affirmed.

[¶53.]    JENSEN, Chief Justice, and KERN and DEVANEY, Justices, concur.

[¶54.]    SALTER, Justice, concurs specially.

SALTER, Justice (concurring specially).

[¶55.] I join the Court's opinion, but I write specially to question whether a separate voluntariness inquiry for Larson's statements is truly necessary, given the fact that his arguments challenging the voluntariness of his *Miranda* waiver and his confession are identical.

[¶56.] The United States Supreme Court has observed that "one virtue of *Miranda* [is] the fact that the giving of the warnings obviates the need for a case-by-case inquiry into the actual voluntariness of the admissions of the accused." *California v. Prysock*, 453 U.S. 355, 359, 101 S. Ct. 2806, 2809, 69 L. Ed. 2d 696 (1981). But this is not to say "that compliance with Miranda conclusively establishes the voluntariness of a subsequent confession" in all instances. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 3147 n.20, 82 L. Ed. 2d 317 (1984). Still, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." *Id.*; s*ee also Dickerson v. U.S.*, 530 U.S. 428, 444, 120 S. Ct. 2326, 2336, 147 L. Ed. 2d 405 (2000).

[¶57.] This is not that type of rare case. Larson's challenge to the voluntariness of his statements is unaccompanied by a claim that they were actually compelled and is otherwise indistinguishable from his argument that his mental state prevented a valid *Miranda* waiver. Therefore, having determined that this waiver was "intelligent, knowing, and voluntary[,]" I believe it is not necessary to undertake the same voluntariness analysis with regard to his confession.